UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH SANGENITO, ZHARGAL DAMPILON, RICHARD GRAD, KEVIN FINLEY, THOMAS KAVANUAGH, SIR ARNOLD GONZALEZ, JOSEPH MANEMANN, DAVID GOODELL, NANCY LITAKER RIDGEWAY, AMARJEET SIDHU, and JAMES ROBBINS, individually and on behalf of all others similarly situated, | Case No.  2:25-cv-17858 |
| Plaintiffs, | |
| vs. | **JURY TRIAL DEMANDED** |
| BMW OF NORTH AMERICA, LLC, and BAYERISCHE MOTOREN WERKE AG, | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................... 1

II.   PARTIES ....................................................................................................... 5

      A.    Plaintiffs ............................................................................................ 5

            1.    Plaintiff Joseph Sangenito .................................................... 5

            2.    Plaintiff Zhargal Dampilon .................................................. 7

            3.    Plaintiff Richard Grad .......................................................... 9

            4.    Plaintiff Kevin Finley ......................................................... 10

            5.    Plaintiff Thomas Kavanaugh .............................................. 12

            6.    Plaintiff Joseph Manemann ................................................ 14

            7.    Plaintiff Sir Arnold Gonzalez ............................................ 15

            8.    Plaintiff David Goodell ...................................................... 17

            9.    Plaintiff Nancy Litaker Ridgeway ..................................... 19

            10.   Plaintiff Amarjeet "AJ" Sidhu ........................................... 21

            11.   Plaintiff James Robbins ...................................................... 22

      B.    Defendants ....................................................................................... 24

            1.    Defendant Bayerische Motoren Werke AG ........................ 24

            2.    Defendant BMW of North America, LLC ........................... 26

III.  JURISDICTION ........................................................................................... 26

      A.    Subject Matter Jurisdiction ............................................................. 26

      B.    Personal Jurisdiction: BMW AG ..................................................... 26

      C.    Personal Jurisdiction: BMW NA ..................................................... 27

IV.   VENUE ........................................................................................................ 28

V.    APPLICABLE LAW .................................................................................... 28

VI.   FACTUAL ALLEGATIONS ....................................................................... 29

      A.    Technical Details ............................................................................. 29

            1.    Mechanical Purpose of a Transfer Case .............................. 29

            2.    Mechanical Consequences of Clutch Issues ....................... 30

      B.    BMW's Knowledge of the Transfer Case Defect ............................. 31

            1.    BMW's Knowledge of the Transfer Case Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data ............... 32

            2.    BMW Was Made Directly Aware of the Defect Via Class Member Complaints Collected by NHTSA's Office of Defect Investigations ....... 33

## TABLE OF CONTENTS

Page

3.    BMW Knew of the Transfer Case Defect as Evidenced by its Own Service Industry Bulletins ........................................................... 37

4.    BMW Knew of the Transfer Case Defect Based on its Receipt of a Large Number of Orders for Replacement Transfer Cases ..................... 38

5.    BMW Was Made Directly Aware of the Transfer Case Defect Based on a Large Number of Class Member Complaints to BMW ......... 39

6.    BMW Knew of the Transfer Case Defect Based on Class Member Complaints on Public Online Forums ...................................................... 41

C.    BMW's Marketing and Concealment .................................................... 43

D.    Fraudulent Concealment Allegations ..................................................... 46

VII.    TOLLING OF THE STATUTE OF LIMITATIONS| ...................................... 49

A.    Fraudulent Concealment Tolling .......................................................... 49

B.    Estoppel ................................................................................................. 49

C.    Discovery Rule ...................................................................................... 49

VIII.    CLASS ALLEGATIONS| ............................................................................... 50

B.    Numerosity and Ascertainability ......................................................... 51

C.    Typicality .............................................................................................. 51

D.    Adequate Representation ....................................................................... 52

E.    Predominance of Common Issues ........................................................ 52

F.    Superiority ............................................................................................. 54

IX.    CLAIMS FOR RELIEF: NATIONWIDE CLAIMS ...................................... 55

FIRST CAUSE OF ACTION Breach of Express Warranty, N.J. Stat. Ann. 12A:2-313 (this cause of action against BMW NA only) ........................ 55

SECOND CAUSE OF ACTION Breach of Implied Warranty, N.J. Stat. Ann. 12A:2-314 (this cause of action against BMW NA only) ............... 60

THIRD CAUSE OF ACTION Violations of New Jersey's Consumer Fraud Act N.J. Stat. Ann. §§ 56:8-1, *et seq.* ............................................. 63

FOURTH CAUSE OF ACTION Fraud by Concealment and/or Nondisclosure ....................................................................................... 66

FIFTH CAUSE OF ACTION Unjust Enrichment ................................................. 70

X.    CLAIMS FOR RELIEF: PLAINTIFFS' STATES OF PURCHASE| ............. 71

A.    California ............................................................................................... 71

SIXTH CAUSE OF ACTION Violation of the California Consumers Legal Remedies Act Cal. Civ. Code §§ 1750, *et seq.* (on behalf of the California State Class) ...................................................................... 71

iii

# TABLE OF CONTENTS

Page

SEVENTH CAUSE OF ACTION Violations of the California Unfair Competition Law  Cal. Bus. & Prof. Code §§ 17200, *et seq.* (on behalf of the California State Class) ......................................................... 74

EIGHTH CAUSE OF ACTION Violations of the California False Advertising Law Cal. Bus. & Prof. Code §§ 17500, *et seq.* (on behalf of the California State Class) ......................................................... 76

NINTH CAUSE OF ACTION Violation of Song-Beverly Consumer Warranty Act, Breach of Implied Warranty Cal. Civ. Code §§ 1790, *et seq.* (on behalf of the California State Class) ............................. 78

TENTH CAUSE OF ACTION Violation of the Song-Beverly Consumer Protection Act, Breach of Express Warranty Cal. Civ. Code §§ 1790, *et seq.* (on behalf of the California State Class) ............................. 80

B.    Illinois ................................................................................................. 81

ELEVENTH CAUSE OF ACTION Violations of Illinois Consumer Fraud and Deceptive Business Practices Act 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.* .................................................................................... 81

TWELFTH CAUSE OF ACTION Violations of Illinois's Uniform Deceptive Trade Practices Act 815 Ill. Comp. Stat. Ann. §§ 505/10, *et seq.* (on behalf of the Illinois State Class) ............................... 85

C.    Ohio ..................................................................................................... 88

THIRTEENTH CAUSE OF ACTION Violations of the Ohio Consumer Sales Practices Act Ohio Rev. Code §§ 1345.01 *et seq.* (on behalf of the Ohio State Class) ....................................................................... 88

FOURTEENTH CAUSE OF ACTION Violations of the Ohio Deceptive Trade Practices Act Ohio Rev. Code §§ 4165.01 *et seq.* (on behalf of the Ohio State Class) ....................................................................... 93

D.    Virginia ............................................................................................... 97

FIFTEENTH CAUSE OF ACTION Violations of the Virginia Consumer Protection Act Va. Code Ann. §§ 59.1, *et seq.* (on behalf of the Virginia State Class) ................................................................................. 97

E.    Iowa ................................................................................................... 101

SIXTEENTH CAUSE OF ACTION Violations of the Iowa Private Right of Action for Consumer Frauds Act Iowa Code Ann. §§ 714H, *et seq.* (on behalf of the Iowa State Class) ................................................ 101

F.    Georgia .............................................................................................. 105

SEVENTEENTH CAUSE OF ACTION Violations of the Georgia Fair Business Practices Act O.C.G.A. §§ 10-1-390, *et seq.* (on behalf of the Georgia State Class) ............................................................... 105

iv

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

          <u>EIGHTEENTH CAUSE OF ACTION</u> Violations of Georgia's Uniform Deceptive Trade Practices Act O.C.G.A. §§ 10-1-370, *et seq.* (on behalf of the Georgia State Class) ........................................................ 108

    G.    North Carolina ................................................................................... 112

          <u>NINETEENTH CAUSE OF ACTION</u> Violations of the North Carolina Unfair Trade Practices Act N.C. Gen. Stat. Ann. §§ 75-1, *et seq.* (on behalf of the North Carolina State Class) ........................................ 112

    H.    Maryland ............................................................................................ 115

          <u>TWENTIETH CAUSE OF ACTION</u> Violations of the Maryland Consumer Protection Act Md. Com. Law Code Ann. §§ 13-101, *et seq.* (on behalf of the Maryland State Class) ........................................ 115

    I.    Washington ........................................................................................ 119

          <u>TWENTY-FIRST CAUSE OF ACTION</u> Violations of the Washington Consumer Protection Act Washington Rev. Code §§ 19.86.010, *et seq.* (on behalf of the Washington State Class) ..................................... 119

XI.    RELIEF REQUESTED| ................................................................................. 123

XII.    DEMAND FOR JURY TRIAL| ..................................................................... 124

I.    **INTRODUCTION**

1.      Plaintiffs Joseph Sangenito, Zhargal Dampilon, Richard Grad, Kevin Finley, Thomas Kavanaugh, Sir Arnold Gonzalez, Joseph Manemann, David Goodell, Nancy Litaker Ridgeway Amarjeet Sidhu, and James Robbins ("Plaintiffs") bring this action individually for themselves and on behalf of all persons who purchased and/or leased certain vehicles equipped with transfer cases that have an identical multi-plate clutch system and are uniformly defective, and were designed, manufactured, distributed, warranted, marketed, and sold by BMW of North America, LLC ("BMW NA") and Bayerische Motoren Werke AG ("BMW AG") (collectively, "BMW").

2.      The vehicles at issue include the BMW 2019-2025 G01 (X3 Sports Activity Vehicle), G02 (X4 Sports Activity Coupe), G05 (X5 Sports Activity Vehicle), G06 (X6 Sports Activity Coupe), G07 (X7 Sports Activity Vehicle), G12 (7 Series Sedan), G14 (8 Series Convertible), G15 (8 Series Coupe), G16 (8 Series Gran Coupe), G20 (3 Series Sedan), G22 (4 Series Coupe), G23 (4 Series Convertible), G26 (4 Series Gran Coupe), G30 (5 Series Sedan), G32 (640i xDrive Gran Turismo), G42 (2 Series Coupe), G45 (X3 Sports Activity Vehicle), G60 (5 Series Sedan) and G70 (7 Series Sedan) models equipped with an XDrive transfer case. (together, the "Class Vehicles").[1]

3.      On information and belief, the transfer cases are substantially the same, from a mechanical engineering standpoint, in all Class Vehicles, in that the transfer cases in all Class Vehicles have a substantially similar design, including an identical multi-plate clutch system and actuator, and are manufactured in a substantially similar manner.

_____

[1] Expressly excluded from the Class Vehicles are the "BMW M line" vehicles, *i.e.*, the F90 (M5 Sedan), F91 (M8 Convertible), F92 (M8 Coupe), F93 (M8 Gran Coupe), F95 (X5 M Sports Activity Vehicle), F96 (X6 M Sports Activity Vehicle), F97 (X3 M Sports Activity Vehicle), and F98 (X4 M Sports Activity Coupe).

4.     The Class Vehicles' transfer cases have a uniform defect that causes the clutch system to improperly transmit torque between the front and rear wheels (the "Transfer Case Defect").  The Transfer Case Defect causes users to experience a jerking or shuddering sensation when driving the vehicle, especially when shifting gears, making turns, or driving at low speeds, which adversely affects the drivability of the Class Vehicles and causes the transfer cases to fail and require replacement.

5.     Before replacing the defective transfer cases, BMW frequently requires customers to replace the transfer case fluid at an out-of-pocket cost of $250 to $1,300 when the fluid replacement is not covered under warranty. However, outside of certain high-performance vehicles like those in the BMW M line, transfer case fluid is filled in the factory with the expectation that it will last for the life of the Class Vehicle. Indeed, transfer case fluid replacement is not listed on the maintenance schedule that BMW provides with every Class Vehicle.

6.     Despite the costly repair, many customers who replace the transfer case fluid continue to experience the Transfer Case Defect and are told subsequently they must replace the transfer case itself, which typically costs between $7,000 and $13,000 when not covered under warranty.

7.     Transfer cases are designed, built, and installed with the expectation that they will last for the life of the vehicle and will never require replacement.

8.     No warning lights or messages appear when the transfer case is damaged, meaning that it is very difficult to diagnose the issue until it progresses far enough to manifest as a jerking or shuddering sensation when driving the vehicle.

9.      BMW is aware, and has been aware, or was reckless in not being aware, since at least 2018 of the risk of transfer case failure in the Class Vehicles, based on the standard pre-sale design and testing information collected by reasonably prudent vehicle manufacturers.

10.      On May 5, of 2020, BMW published Service Industry Bulletin ("SIB") 27-02-20, titled "Jerking or Shuddering From The Driveline (XDrive Transfer Case ATX13-X)." BMW issued five revised SIBs, including as recently as June of 2025, most of which expanded the list of affected models. It has not issued any further revisions since.  Each of the Class Vehicles is listed as an affected model in the newest iteration of SIB 27-02-20.

11.      In the past, when customers who experienced the defect contacted BMW, it disavowed all knowledge of the problem and refused to fully reimburse owners for the repairs and transfer case replacement, which typically costs anywhere from $7,000 to $13,000.

12.      As a result of BMW's alleged misconduct, Plaintiffs and Class Members were harmed and suffered a diminution of value at the point of sale in that Plaintiffs and Class Members paid for vehicles that were merchantable and fit for their ordinary purpose and free of material defects, but received another, less valuable vehicle with a Transfer Case Defect. Plaintiffs and Class Members have also suffered actual injury in that they have paid (and will continue to be required to pay) out-of-pocket to replace fluid that should not have to be replaced and to replace the defective transfer cases during the expected useful life of the vehicles, and/or were or will be forced to stop or limit using their vehicles prematurely or sell them at steep discounts.

13.      Despite having knowledge of the Transfer Case Defect since at least 2018, BMW has not admitted to or resolved the Transfer Case Defect. BMW appears to cover the fluid change replacement and transfer case replacement for owners and lessees that are still within the

original New Vehicle Limited Warranty, but does not cover either of these services for owners and lessees whose warranty has expired. Furthermore, BMW's SIB 27-02-20 explicitly states that transfer case fluid replacement is not covered under the Certified Pre-Owned warranty or Extended Service Contract even though the transfer case itself is not excluded from coverage by the terms of the Certified Pre-Owned warranty.

14.     All Plaintiffs suffered ascertainable loss.  Plaintiffs Sangenito, Dampilon, Finley, Kavanaugh, Manemann, Gonzalez, Ridgeway, Sidhu, and Goodell were required to pay out of pocket to replace the transfer case fluid in their Class Vehicles, and Plaintiffs Goodell, Grad, and Robbins were required to pay out of pocket to replace the transfer cases in their Class Vehicles.

15.     BMW has issued no recall or extended warranty regarding the Transfer Case Defect, nor sent notice to Class Vehicle owners and lessees regarding the possibility of transfer case failure. Instead, BMW has concealed and continues to actively conceal the Transfer Case Defect.

16.     On October 6, 2025, Plaintiffs through their counsel sent a letter requesting relief including reimbursement for out-of-pocket expenses already paid and repair of the defects exhibited in Class Vehicles for Plaintiffs and others similarly situated.

17.     In response, on November 17, 2025, BMW, through counsel, notified Plaintiffs' counsel that it is now considering extending the warranty for the Class Vehicles' transfer cases, but gave no indication that it intends to send notice of any extension to all owners and lessees of Class Vehicles.  It also gave no indication it intends to compensate Plaintiffs or Class Members for the diminution in value of their vehicles, nor compensate them for their out-of-pocket costs already paid for replacement transfer case fluid and/or transfer cases, loss of resale value of the Class Vehicle, services performed by independent mechanics, and miscellaneous expenses

incurred by Class Members as a result of the Transfer Case Defect (*i.e.*, rental car fees, etc.). Simply put, BMW neither offered any actual relief in response to Plaintiffs' October 6, 2025 letter, nor committed to doing so. Furthermore, absent a design change to the clutch system of the Class Vehicles, the Transfer Case Defect will continue to manifest in the Class Vehicles even if the transfer case is replaced.

18.     BMW's response does not address the full scope of loss suffered by Plaintiffs and Class Members as set forth in their notice letter, even if BMW ultimately extends the warranty— which apparently remains to be decided.

19.     On behalf of themselves and all others similarly situated, Plaintiffs seek: a) actual damages, b) statutory damages, c) exemplary and/or punitive damages, d) declaratory relief, e) injunctive relief, f) pre- and post-judgment interest, and g) attorneys' fees and costs.

## II.    PARTIES

### A.    Plaintiffs

#### 1.    Plaintiff Joseph Sangenito

20.     Plaintiff Joseph Sangenito resides in Pompton Plains, New Jersey.

21.     Mr. Sangenito owned a 2020 BMW X5, which he purchased new in June of 2020 from BMW of Morristown, a BMW dealership in Morristown, New Jersey.

22.     Mr. Sangenito's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXCR6C09L9B49834.

23.     Mr. Sangenito purchased the Class Vehicle for his personal, family, and household use.

24.     Mr. Sangenito expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case of his Class Vehicle would fail, nor was he aware from any source prior to purchase of the Class Vehicle of

the significant expense he would incur should he choose to replace the defective transfer case. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

25.     Since purchasing the Class Vehicle, Mr. Sangenito has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at a BMW dealership.

26.     Mr. Sangenito first became aware of the Transfer Case Defect in July of 2025 when his vehicle began vibrating when making slow turns. He brought the Class Vehicle into BMW of Morristown on July 31, 2025. The mechanic replaced the Class Vehicle's transfer case fluid and charged him a total of $1,061.44. The mechanic further informed Mr. Sangenito that he would need to replace the transfer case itself if the problem did not improve after driving the vehicle for up to 500 miles and quoted Mr. Sangenito $9,515.22 for a transfer case replacement. At the time the mechanic diagnosed the transfer case issue, the Class Vehicle had only 57,000 miles.

27.     Mr. Sangenito reports that the shuddering sensation grew significantly worse immediately after the transfer fluid change and began occurring when he reversed the vehicle as well.

28.     Mr. Sangenito ultimately decided to replace the Class Vehicle rather than pay to have it repaired.

29.     The Transfer Case Defect resulted in a signficiant loss of value for Mr. Sangenito's Class Vehicle: Although BMW of Morristown verbally offered him $28,000 to trade in his vehicle in June 2025, one month before the vibration issue began, Mr. Sangenito received $22,000 in trade-in value from Paul Miller BMW in August of 2025.

6

30.     As a result of the Transfer Case Defect, Mr. Sangenito incurred costs of $1,061.44 for the transfer case fluid replacement, as well as diminished trade-in value of approximately $6,000.

31.     Mr. Sangenito regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his BMW X5 in 2020. Although he does not recall the specifics of the many BMW advertisements he saw before he purchased his Class Vehicle, he does recall that reliability was a frequent theme. Those advertisements about reliability influenced his decision to purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Sangenito that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay $1,061.44 in repair costs and lose approximately $6,000 in resale value, he would not have purchased his Class Vehicle, or would have paid less for it.

32.     On October 6, 2025, Mr. Sangenito, through counsel, sent BMW a letter requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Sangenito and others similarly situated. Ex. A. In response to this letter, BMW did not offer the requested relief.

        **2.      Plaintiff Zhargal Dampilon**

33.     Plaintiff Zhargal Dampilon resides in Irvine, California.

34.     Mr. Dampilon owns a 2019 BMW X5, which he purchased certified preowned in 2022 from Crevier BMW, a BMW dealership located in Santa Ana, California.

35.     Mr. Dampilon's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXCR6C55KLL62483.

36.     Mr. Dampilon purchased the Class Vehicle for his personal, family, and household use.

37.     Mr. Dampilon expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case fluid of his Class Vehicle would require premature replacement, nor was he aware from any source prior to the purchase of the Class Vehicle of the significant expense he would incur in replacing the transfer case fluid. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

38.     Since purchasing the Class Vehicle, Mr. Dampilon has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at either a BMW dealership or a BMW-certified mechanic.

39.     Mr. Dampilon first became aware of the Transfer Case Defect in the summer of 2025 after his Class Vehicle had been shuddering at low speeds and during turns for several months. He submitted an online message to Crevier BMW in August of 2025 explaining the problem. In response, Crevier BMW left him a voicemail quoting him between $1,200 and $1,500 to replace the transfer case fluid because it was a "condition-based service" that "doesn't always have to be done" and thus would not be covered even under the New Vehicle Limited Warranty. At that time, the Class Vehicle had less than 50,000 miles.

40.     Mr. Dampilon ultimately chose to pay over $175 to have the transfer case fluid in the Class Vehicle replaced by an independent mechanic; however, the shuddering sensation has not been completely resolved.

41.     Mr. Dampilon regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his BMW X5 in 2022. Although he does not recall the specifics of the many BMW advertisements he saw before he purchased his Class Vehicle, he does recall that

reliability was a frequent theme. Those advertisements about reliability influenced his decision to purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Dampilon that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay over $175 in repair costs, he would not have purchased his Class Vehicle, or would have paid less for it.

42.     On October 6, 2025, Mr. Dampilon, through counsel, sent BMW a letter requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Dampilon and others similarly situated. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

### 3.    Plaintiff Richard Grad

43.     Plaintiff Richard Grad resides in Vernon Hills, Illinois.

44.     Mr. Grad owns a 2022 BMW X5, which he purchased new in 2021 from Voss Auto Network, an authorized BMW dealership, in Ohio.

45.     Mr. Grad's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXCR6C09N9K49576.

46.     Mr. Grad purchased the Class Vehicle for his personal, family, and household use.

47.     Mr. Grad expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case of his Class Vehicle would fail, nor was he aware from any source prior to purchase of the Class Vehicle of the significant expense he would incur in replacing the defective transfer case. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

48.     Since purchasing the Class Vehicle, Mr. Grad has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at a BMW dealership.

49.     Mr. Grad first became aware of the Transfer Case Defect when he noticed a strange noise and vibration coming from the Class Vehicle after his daughter had borrowed it. Mr. Grad brought the Class Vehicle to a BMW dealership for repair in April of 2025. The dealership initially quoted Mr. Grad $8,000 to replace the transfer case because the Class Vehicle was out of warranty. However, because he had purchased an extended warranty for his vehicle, the BMW dealership ultimately charged him a total of approximately $2,800. Mr. Grad still experiences the vibration issue. At the time the mechanic diagnosed the transfer case issue, the vehicle had approximately 60,000 miles.

50.     Mr. Grad regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his BMW X5 in 2021. Although he does not recall the specifics of the many BMW advertisements he saw before he purchased his Class Vehicle, he does recall that reliability was a frequent theme. Those advertisements about reliability influenced his decision to purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Grad that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay $2,800 in repair costs, he would not have purchased his Class Vehicle, or would have paid less for it.

51.     On October 6, 2025, Mr. Grad, through counsel, sent BMW a letter requesting relief and repair of the defects exhibited in Class Vehicles for Mr. Grad and others similarly situated. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

### 4.     Plaintiff Kevin Finley

52.     Plaintiff Kevin Finley resides in Algonquin, Illinois.

53.     Mr. Finley owns a 2020 BMW X5, which he purchased certified preowned in 2024 from Patrick BMW, a BMW dealership located in Schaumburg, Illinois.

10

54.     Mr. Finley's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXCR6C00LLL66396.

55.     Mr. Finley purchased the Class Vehicle for his personal, family, and household use.

56.     Mr. Finley expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case fluid of his Class Vehicle would require premature replacement, nor was he aware from any source prior to the purchase of the Class Vehicle of the significant expense he would incur in replacing the transfer case fluid. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

57.     Since purchasing the Class Vehicle, Mr. Finley has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at either a BMW dealership or a BMW-certified mechanic.

58.     Mr. Finley first became aware of the Transfer Case Defect in December of 2024 when he brought his Class Vehicle to Patrick BMW because his Class Vehicle was shuddering while turning and reversing at low speeds. The dealership determined that the transfer case fluid should be replaced per BMW's SIB 27-02-20 and quoted him $819.85.  At the time the mechanic diagnosed the transfer case issue, the Class Vehicle had less than 52,000 miles.

59.     Mr. Finley ultimately chose to pay over $494 to have the transfer case fluid replaced by an independent mechanic.

60.     Mr. Finley regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his BMW X5 in 2024. Although he does not recall the specifics of the many

BMW advertisements he saw before he purchased his Class Vehicle, he does recall that reliability was a frequent theme. Those advertisements about reliability influenced his decision to purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Finley that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay over $494 in repair costs, he would not have purchased his Class Vehicle, or would have paid less for it.

61. The notice letters sent to BMW by Plaintiffs on October 6, 2025, requesting relief and repair of the defects exhibited in the Class Vehicles are sufficient to constitute notice of Mr. Finley's claims, as they are substantively identical to those of the Plaintiffs named in the letter. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

### 5. Plaintiff Thomas Kavanaugh

62. Plaintiff Thomas Kavanaugh resides in Powell, Ohio.

63. Mr. Kavanaugh owns a 2020 BMW X5, which he purchased new in June of 2020 from Kelly BMW, a BMW dealership located in Columbus, Ohio.

64. Mr. Kavanaugh's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXJU4C00L9D15331.

65. Mr. Kavanaugh purchased the Class Vehicle for his personal, family, and household use.

66. Mr. Kavanaugh expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case fluid and transfer case of his Class Vehicle would require replacement, nor was he aware from any source prior to the purchase of the Class Vehicle of the significant expense he would incur in replacing the transfer case fluid. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

12

67.     Since purchasing the Class Vehicle, Mr. Kavanaugh has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at either a BMW dealership or a BMW-certified mechanic.

68.     Mr. Kavanaugh first became aware of the Transfer Case Defect in 2024 when he noticed that his Class Vehicle shook and rattled when he drove in reverse or turned the steering wheel sharply to the right. Mr. Kavanaugh brought his Class Vehicle to Kelly BMW in February of 2024. The dealership road tested the vehicle to verify Mr. Kavanaugh's concerns. Per BMW's SIB 27-02-20, it disconnected the transfer case and road tested the vehicle once again, at which point it found the sensation no longer present. The dealership charged Mr. Kavanaugh $90 to perform this diagnosis. It then replaced the Class Vehicle's transfer case fluid in accordance with BMW's SIB 27-02-20 and charged Mr. Kavanaugh over $206 for this service. The amount charged for the diagnosis and fluid replacement reflects a 50/50 split in costs between Mr. Kavanaugh and the dealership, which the dealership ultimately offered in response to Mr. Kavanaugh's complaints. At the time the mechanic diagnosed the transfer case issue, the Class Vehicle had less than 53,000 miles.

69.     The fluid change did not resolve the shaking and rattling sensation, and the dealership replaced the transfer case of Mr. Kavanaugh's Class Vehicle a few months later. This service was covered under a BMW extended warranty Mr. Kavanaugh had purchased.

70.     Mr. Kavanaugh regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his BMW X5 in 2020. Although he does not recall the specifics of the many BMW advertisements he saw before he purchased his Class Vehicle, he does recall that reliability was a frequent theme. Those advertisements about reliability influenced his decision to

purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Kavanaugh that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay over $296 in repair costs, he would not have purchased his Class Vehicle, or would have paid less for it.

71.     The notice letters sent to BMW by Plaintiffs on October 6, 2025, requesting relief and repair of the defects exhibited in the Class Vehicles are sufficient to constitute notice of Mr. Kavanaugh's claims, as they are substantively identical to those of the Plaintiffs named in the letter. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

### 6.     Plaintiff Joseph Manemann

72.     Plaintiff Joseph Manemann resides in Morrison, Illinois.

73.     Mr. Manemann owns a 2019 BMW X5, which he purchased new in July of 2019 from Kimberly BMW, a BMW dealership located in Davenport, Iowa.

74.     Mr. Manemann's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXCR6C51KLL60861.

75.     Mr. Manemann purchased the Class Vehicle for his personal, family, and household use.

76.     Mr. Manemann expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case fluid of his Class Vehicle would require premature replacement, nor was he aware from any source prior to the purchase of the Class Vehicle of the significant expense he would incur in replacing the transfer case fluid. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

14

77.     Since purchasing the Class Vehicle, Mr. Manemann has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at either a BMW dealership or a BMW-certified mechanic.

78.     Mr. Manemann first became aware of the Transfer Case Defect in 2024 when he noticed that there was a shuddering sensation coming from the transfer case of his Class Vehicle. Mr. Manemann brought his Class Vehicle to Kimberly BMW in July of 2024. Pursuant to BMW's SIB 27-02-20, the dealership replaced the Class Vehicle's transfer case fluid and charged Mr. Manemann over $537 for the service. At this time, the Class Vehicle had less than 58,000 miles.

79.     Mr. Manemann regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his BMW X5 in 2019. Although he does not recall the specifics of the many BMW advertisements he saw before he purchased his Class Vehicle, he does recall that reliability was a frequent theme. Those advertisements about reliability influenced his decision to purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Manemann that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay over $537 in repair costs, he would not have purchased his Class Vehicle, or would have paid less for it.

80.     The notice letters sent to BMW by Plaintiffs on October 6, 2025, requesting relief and repair of the defects exhibited in the Class Vehicles are sufficient to constitute notice of Mr. Manemann's claims, as they are substantively identical to those of the Plaintiffs named in the letter. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

### 7.     Plaintiff Sir Arnold Gonzalez

81.     Plaintiff Sir Arnold Gonzalez resides in Chesapeake, Virginia.

15

82.     Mr. Gonzalez owns a 2021 BMW X5, which he purchased new in December of 2020 from Checkered Flag BMW, a BMW dealership located in Virginia Beach, Virginia.

83.     Mr. Gonzalez's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXTA6C09M9F39017.

84.     Mr. Gonzalez purchased the Class Vehicle for his personal, family, and household use.

85.     Mr. Gonzalez expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case fluid of his Class Vehicle would require premature replacement, nor was he aware from any source prior to the purchase of the Class Vehicle of the significant expense he would incur in replacing the transfer case fluid. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

86.     Since purchasing the Class Vehicle, Mr. Gonzalez has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at either a BMW dealership or a BMW-certified mechanic.

87.     Mr. Gonzalez first became aware of the Transfer Case Defect in 2025. He brought his Class Vehicle to Checkered Flag BMW in August of 2025 for repair and provided a copy of BMW's SIB 27-02-20 to his service advisor. The BMW service technician was able to duplicate the symptoms that Mr. Gonzalez reported and accordingly replaced the Class Vehicle's transfer case fluid and test drove the vehicle for approximately 125 miles per the SIB's instructions. The dealership charged Mr. Gonzalez over $346 for the service. The BMW service advisor further advised Mr. Gonzalez that if the fluid change did not resolve the symptoms, the transfer case itself would need to be replaced. At this time, the Class Vehicle had less than 40,000 miles.

88.     Mr. Gonzalez regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his BMW X5 in 2020. Although he does not recall the specifics of the many BMW advertisements he saw before he purchased his Class Vehicle, he does recall that reliability was a frequent theme. Those advertisements about reliability influenced his decision to purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Gonzalez that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay over $346 in repair costs, he would not have purchased his Class Vehicle, or would have paid less for it.

89.     The notice letters sent to BMW by Plaintiffs on October 6, 2025, requesting relief and repair of the defects exhibited in the Class Vehicles are sufficient to constitute notice of Mr. Gonzalez's claims, as they are substantively identical to those of the Plaintiffs named in the letter. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

**8.     Plaintiff David Goodell**

90.     Plaintiff David Goodell resides in Vienna, Virginia.

91.     Mr. Goodell owned a 2020 BMW X5 M50i, which he purchased certified preowned in April of 2023 from Nalley BMW, a BMW dealership located in Decatur, Georgia.

92.     Mr. Goodell's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXJU4C04L9C04829.

93.     Mr. Goodell purchased the Class Vehicle for his personal, family, and household use.

94.     Mr. Goodell expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case fluid and transfer case of his Class Vehicle would require replacement, nor was he aware from any source prior to

17

the purchase of the Class Vehicle of the significant expense he would incur in replacing the transfer case fluid and transfer case. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

95.     Since purchasing the Class Vehicle, Mr. Goodell has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at either a BMW dealership or a BMW-certified mechanic.

96.     Mr. Goodell first became aware of the Transfer Case Defect in 2025 when he began to experience a shuddering sensation at low speeds, in reverse, and while turning. He brought his Class Vehicle to BMW of Fairfax in April of 2025. The dealership told Mr. Goodell that his transfer case was "due for service" and recommended Mr. Goodell replace the transfer case fluid. BMW of Fairfax quoted Mr. Goodell $329.68.  At this time, the Class Vehicle had less than 48,000 miles.

97.     Mr. Goodell then brought his Class Vehicle to an independent mechanic, who confirmed a "very aggressive shutter" that could be felt "at any parking lot speeds." Pursuant to BMW's SIB 27-02-20, the mechanic changed the transfer case fluid and performed a test drive of 126 miles. The mechanic charged Mr. Goodell over $239 to have the transfer case fluid replaced. However, the fluid change did not resolve the issue, as the technician confirmed the "transfer box jerking" was "still present." Mr. Goodell was then told that his transfer case needed to be replaced. Mr. Goodell had purchased an after-market warranty for his Class Vehicle, which covered most of the approximately $7,100 cost of the transfer case replacement. Mr. Goodell ultimately paid over $1,500 out of pocket for this service.

98.     Mr. Goodell regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years

before he purchased his BMW X5 M50i in 2023. Although he does not recall the specifics of the many BMW advertisements he saw before he purchased his Class Vehicle, he does recall that reliability was a frequent theme. Those advertisements about reliability influenced his decision to purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Goodell that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay over $1,739 in repair costs, he would not have purchased his Class Vehicle, or would have paid less for it.

99.     The notice letters sent to BMW by Plaintiffs on October 6, 2025, requesting relief and repair of the defects exhibited in the Class Vehicles are sufficient to constitute notice of Mr. Goodell's claims, as they are substantively identical to those of the Plaintiffs named in the letter. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

### 9.    **Plaintiff Nancy Litaker Ridgeway**

100.     Plaintiff Nancy Litaker Ridgeway resides in Fort Mill, South Carolina.

101.     Mrs. Ridgeway owns a 2021 BMW X5, which she purchased new in June of 2021 from Hendrick BMW, a BMW dealership located in Charlotte, North Carolina.

102.     Mrs. Ridgeway's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXCR6C03M9H47094.

103.     Mrs. Ridgeway purchased the Class Vehicle for her personal, family, and household use.

104.     Mrs. Ridgeway expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the transfer case fluid of her Class Vehicle would require premature replacement, nor was she aware from any source prior to the purchase of the Class Vehicle of the significant expense she would incur in replacing the

transfer case fluid. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

105.    Since purchasing the Class Vehicle, Mrs. Ridgeway has brought her vehicle in to be serviced and inspected at least as often as recommended by BMW at either a BMW dealership or a BMW-certified mechanic.

106.    Mrs. Ridgeway first became aware of the Transfer Case Defect in 2025 when she noticed a shuddering sensation while driving her Class Vehicle.  Mrs. Ridgeway brought her Class Vehicle to Hendrick BMW in December of 2025, which verified that the shudder was present. Pursuant to BMW's SIB 27-02-20, the dealership deactivated the transfer case and verified that the shudder was not present without it and therefore diagnosed a transfer case issue. The dealership accordingly replaced the Class Vehicle's transfer case fluid and charged Mrs. Ridgeway over $768 for the service. The dealership advised Mrs. Ridgeway to drive the Class Vehicle for at least 125 miles and "monitor for shudder." It further provided a "cautionary estimate" of over $10,128 to replace the transfer case "if shudder is still present after transfer case oil service is performed and fluid has had time to work through transfer case." At this time, the Class Vehicle had less than 31,000 miles.

107.    Mrs. Ridgeway regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before she purchased her BMW X5 in 2021. Although she does not recall the specifics of the many BMW advertisements she saw before she purchased her Class Vehicle, she does recall that reliability was a frequent theme. Those advertisements about reliability influenced her decision to purchase her vehicle. Had those advertisements or any other BMW materials disclosed to Mrs. Ridgeway that the Class Vehicles had defective transfer cases that would render her vehicle

unreliable and that she would be required to pay over $768 in repair costs, she would not have purchased her Class Vehicle, or would have paid less for it.

108.    The notice letters sent to BMW by Plaintiffs on October 6, 2025, requesting relief and repair of the defects exhibited in the Class Vehicles are sufficient to constitute notice of Mrs. Ridgeway's claims, as they are substantively identical to those of the Plaintiffs named in the letter. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

### 10.    **Plaintiff Amarjeet "AJ" Sidhu**

109.    Plaintiff AJ Sidhu resides in Catonsville, Maryland.

110.    Mr. Sidhu owns a 2020 BMW X5, which he leased from BMW of Towson, a BMW dealership located in Towson, Maryland, beginning in October of 2019 and purchased off the lease in May of 2023.

111.    Mr. Sidhu's Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXCR6C04L9B22587.

112.    Mr. Sidhu leased and purchased the Class Vehicle for his personal, family, and household use.

113.    Mr. Sidhu expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case fluid of his Class Vehicle would require premature replacement, nor was he aware from any source prior to the purchase of the Class Vehicle of the significant expense he would incur in replacing the transfer case fluid. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

114.    Since purchasing the Class Vehicle, Mr. Sidhu has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at either a BMW dealership or a BMW-certified mechanic.

115.    Mr. Sidhu first became aware of the Transfer Case Defect in the spring of 2025, when he noticed a shuddering sensation. He brought his Class Vehicle to an independent service center in May of 2025 for repair. The dealership performed the transfer case service pursuant to BMW's SIB 27-02-20 and charged Mr. Sidhu over $420 to replace the transfer case fluid. It further advised Mr. Sidhu to drive the vehicle for a minimum of 125 miles to see whether the shuddering had improved. At this time, the Class Vehicle had less than 87,000 miles. Although the shuddering sensation appeared to resolve for a few months after the service, it has since returned.

116.    Mr. Sidhu regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he leased his BMW X5 in 2019 and purchased it in 2023. Although he does not recall the specifics of the many BMW advertisements he saw before he purchased his Class Vehicle, he does recall that reliability was a frequent theme. Those advertisements about reliability influenced his decision to purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Sidhu that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay over $420 in repair costs, he would not have purchased his Class Vehicle, or would have paid less for it.

117.    The notice letters sent to BMW by Plaintiffs on October 6, 2025, requesting relief and repair of the defects exhibited in the Class Vehicles are sufficient to constitute notice of Mr. Sidhu's claims, as they are substantively identical to those of the Plaintiffs named in the letter. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

           **11.    Plaintiff James Robbins**

118.    Plaintiff James Robbins resides in Burien, Washington.

22

119.    Mr. Robbins owns a 2019 BMW X5, which he purchased new in December of 2018 from BMW Northwest, a BMW dealership located in Tacoma, Washington.

120.    Mr. Robbins' Class Vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by BMW, and bears the VIN 5UXJU2C50KLN64405.

121.    Mr. Robbins purchased the Class Vehicle for his personal, family, and household use.

122.    Mr. Robbins expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the transfer case fluid and transfer case of his Class Vehicle would require replacement, nor was he aware from any source prior to the purchase of the Class Vehicle of the significant expense he would incur in replacing the transfer case fluid and transfer case. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

123.    Since purchasing the Class Vehicle, Mr. Robbins has brought his vehicle in to be serviced and inspected at least as often as recommended by BMW at either a BMW dealership or a BMW-certified mechanic.

124.    Mr. Robbins first became aware of the Transfer Case Defect in 2024. He spent over ten hours attempting to diagnose the cause of the noise from the transfer case himself and paid over $1,200 to replace the Class Vehicles' tires twice with the hopes it would resolve the noise. After these measures failed, he brought his Class Vehicle to BMW Northwest in May of 2024 for repair. The dealership did not acknowledge the Transfer Case Defect or any issue with Mr. Robbins' Class Vehicle until he test drove it with a service manager for around 25 minutes. The dealership diagnosed the transfer case issue by disconnecting the transfer case to test drive the vehicle and confirmed the noise did not occur with the transfer case disconnected. It then

replaced the Class Vehicle's transfer case fluid and test drove it for over 125 miles. Because the shuddering sensation had not resolved, the dealership recommended transfer case replacement. Mr. Robbins was able to negotiate an 85% discount from the approximately $9,757 cost of the transfer case replacement as a gesture of goodwill from the dealership, and the dealership accordingly charged him approximately $1,200 total. At this time, the Class Vehicle had less than 31,000 miles.

125.    Mr. Robbins regularly saw advertisements for BMW vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the internet during the years before he purchased his BMW X5 in 2018. Although he does not recall the specifics of the many BMW advertisements he saw before he purchased his Class Vehicle, he does recall that reliability was a frequent theme. Those advertisements about reliability influenced his decision to purchase his vehicle. Had those advertisements or any other BMW materials disclosed to Mr. Robbins that the Class Vehicles had defective transfer cases that would render his vehicle unreliable and that he would be required to pay over $1,200 in repair costs, he would not have purchased his Class Vehicle, or would have paid less for it.

126.    The notice letters sent to BMW by Plaintiffs on October 6, 2025, requesting relief and repair of the defects exhibited in the Class Vehicles are sufficient to constitute notice of Mr. Robbins' claims, as they are substantively identical to those of the Plaintiffs named in the letter. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

**B.    Defendants**

**1.    Defendant Bayerische Motoren Werke AG**

127.    Defendant BMW AG is a German corporation with its principal place of business in Munich, Germany.

128.    At all times relevant herein, BMW AG (itself and through its related entities) engaged in the business of designing and manufacturing the Class Vehicles.

129.    Upon information and belief, BMW AG was chiefly responsible for designing the Class Vehicles, including their defective transfer cases.

130.    Upon information and belief, BMW AG has, and at all relevant times had, the contractual right to exercise, and in practice has exercised, control over BMW NA's work, including but not limited to the design of Class Vehicles, the manner of Class Vehicles' marketing, the scope of written warranties, the scope of repairs in practice to be covered under warranty, and representations made and facts withheld from consumers and the public about the Transfer Case Defect. BMW AG has been directly involved in assisting, directing, and controlling BMW NA, and BMW NA's authorized dealers' handling of Class Member complaints and warranty claims regarding the Transfer Case Defect.

131.    BMW AG has held BMW NA out as its agent for all purposes in the United States, but especially for sales and marketing of Class Vehicles and for ongoing management of relationships with purchasers of Class Vehicles. It established BMW NA as its wholly-owned subsidiary company. It named BMW NA with its official "BMW" title. It provided BMW NA with marketing and technical materials avoiding any distinction between BMW AG and BMW NA, and instead representing BMW NA as nothing less than BMW AG's presence in the United States for purposes of selling and leasing "BMW" brand vehicles and providing related services.

132.    Based on the foregoing actions, Plaintiffs and Class Members justifiably relied on BMW AG's representations and omissions regarding the Class Vehicles that were the responsibility of BMW AG in, for example, BMW AG's design of Class Vehicles, and were injured because of their purchase of defective Class Vehicles.

2.     **Defendant BMW of North America, LLC**

133.    Defendant BMW of North America, LLC ("BMW NA") is a Delaware corporation with its principal place of business in Woodcliff Lake, New Jersey.

134.    BMW NA is a wholly-owned subsidiary of BMW AG.

135.    At all times relevant herein, BMW NA has been and has acted as an agent of BMW AG and subject to BMW AG's control.

136.    At all times relevant herein, BMW NA (itself and through its related entities) engaged in the business of marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, throughout the United States.

## III.    JURISDICTION

### A.    Subject Matter Jurisdiction

137.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act because: the amount in controversy exceeds $5,000,000, and Defendant BMW AG is a citizen of a foreign country, and is thus diverse from all Plaintiffs and Class Members.  In addition, Defendant BMW NA is a citizen of New Jersey, and is therefore diverse from at least one Plaintiff.  28 U.S.C. § 1332(d)(2)(A).

### B.    Personal Jurisdiction: BMW AG

138.    This Court has personal jurisdiction over BMW AG because BMW AG has sufficient contacts in this District that relate to the causes of action pleaded against BMW NA.

139.    By headquartering its wholly-owned subsidiary BMW NA in this District, and using BMW NA as its channel for marketing, distributing, warranting, selling and leasing the BMW AG-designed Class Vehicles in the District and the United States, BMW AG itself has continuously and deliberately taken affirmative steps to make BMW AG-designed vehicles and replacement parts available to consumers in the District and the rest of New Jersey, including

Plaintiffs and Class Members; created continuing obligations between BMW AG and residents of the District; and purposefully availed itself of the benefits and protections of conducting business in the District.

140.    On information and belief, BMW AG employees and representatives regularly visit BMW NA, thereby continuously conducting business in this District.

141.    Further, BMW AG's wholly-owned subsidiary BMW NA is at home in this District, and BMW NA's contacts in this District can be attributed to BMW AG.

142.    Plaintiffs' claims here arise out of BMW AG's contacts with this District, particularly in that Plaintiffs could not even have purchased their Class Vehicles if not for BMW AG's intentional acts of designing the Class Vehicles (including their defective transfer cases) and exporting them for sale to customers in this District and the United States as a whole, including Plaintiffs and Class Members.

143.    These constitute a strong relationship between BMW AG, this District, and the allegations herein, and create a sufficient basis to render the exercise of jurisdiction over BMW AG by this Court permissible under traditional notions of fair play and substantial justice.

### C.    **Personal Jurisdiction: BMW NA**

144.    This Court has personal jurisdiction over BMW NA because BMW NA is authorized to do business in this District, conducts substantial business in the District, has its principal place of business in the District, is at home in the District, and some of the actions giving rise to the complaint took place in the District.

145.    Each of these facts independently is, and all of these facts together are, sufficient to render the exercise of jurisdiction by this Court over BMW NA permissible under traditional notions of fair play and substantial justice.

IV.    **VENUE**

146.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

147.    Additionally, Defendants transact business within the District, BMW NA has its principal place of business in this District, and many of the events establishing the claims occurred in this District.

V.    **APPLICABLE LAW**

148.    Plaintiffs seek damages and equitable relief on behalf of themselves and the Class Members as a nationwide class under New Jersey law. New Jersey law should govern the claims of the nationwide class because New Jersey has a significant relationship to both the misconduct at issue here and the parties to this litigation, as BMW's acts, practices, and omissions regarding the Transfer Case Defect were directed and emanated from BMW NA's headquarters in New Jersey.

149.    As a result, New Jersey has a significant interest in regulating the conduct of a corporation whose principal place of business within the United States is in New Jersey.

150.    New Jersey also has a significant aggregation of contacts to the claims of each Class Member such that application of New Jersey law to the claims of all Class Members is neither arbitrary nor fundamentally unfair to Defendants or Class Members.

151.    In the alternative, Plaintiffs seek damages and equitable relief under each the respective state laws of themselves and all Class Members, which are substantially similar with respect to these facts and legal claims, and/or can be subdivided into a small number of groups to reflect any material differences in the law with respect to these claims.

## VI.    FACTUAL ALLEGATIONS

### A.    Technical Details

#### 1.    Mechanical Purpose of a Transfer Case

152.    All-wheel-drive and four-wheel-drive vehicles, including the Class Vehicles, contain a transmission component called the transfer case as part of the drivetrain, which transfers power from the transmission of the motor vehicle to the driven axles.

153.    The diagram below illustrates a BMW transfer case using a gear drive, as used in many of the Class Vehicles:



154.    The transfer case receives power from the transmission of the vehicle (shown at No. 1 in the above diagram) and splits it between the rear (shown at No. 2 in the above diagram) and front (shown at No. 3 in the above diagram) wheels.

155. BMW vehicles equipped with the xDrive system, including the Class Vehicles, uniformly use an identical multi-plate clutch system (shown at No. 5 in the above diagram) that can electronically vary the amount of torque directed to the front and rear wheels. This system allows the vehicle to conserve fuel when four-wheel-drive is not needed and can affect the vehicle traction capability and dynamics. For example, if the rear wheels begin to slip, the transfer case can electronically remove torque from the wheels that have lost traction and put more torque into the wheels that have traction.

156. The transfer cases are filled with manual transmission fluid. Clutches rely on friction to transmit torque. The fluid controls the friction conditions between the clutch components: steel discs and composite discs. The steel discs separate the composite discs and provide a highly finished friction surface for them to run on.

157. Because the clutch discs are continually slipping against one another, the fluid must cool the discs to ensure that they do not overheat and to control the amount of friction between the discs, which determines how much torque moves through the clutch system.

### 2.    Mechanical Consequences of Clutch Issues

158. When an owner or lessee reports a jerking or shuddering sensation to a BMW dealership, BMW's SIB 27-02-20 first instructs the dealer to inspect the vehicle for unevenly worn or improperly fitted tires, which can cause problems with the clutch. If there is no issue with the tires, the dealer is instructed to electronically disconnect the clutch and test drive the vehicle. If the juddering sensation is not present during the test drive, the dealer diagnoses a clutch issue.

159. Once a clutch issue is diagnosed, the dealer first replaces the transfer case fluid and instructs the owner or lessee to drive the vehicle for at least 125 miles. If the problem is not

resolved at that point, the clutches have been damaged and the owner or lessee must replace the transfer case, as was the case for Plaintiffs Kavanaugh, Goodell, and Robbins.

160.    When the clutches do not function properly, vehicle users experience a juddering sensation due to an improper split of torque between the front and rear wheels, typically during low-speed maneuvers, and especially when turning the vehicle.

161.    A transfer case is designed, built, and installed with the expectation that it will never fail or need to be replaced.

162.    The cost of a transfer case replacement, including parts and labor, is between $7,000 and $13,000.

163.    In the Class Vehicles, transfer case fluid is filled with the expectation that it will last for the life of the vehicle.  In fact, BMW's maintenance guide describes transfer case fluid as a "long-term rated fluid" and states that "replacement is only necessary when repairs are being performed."

164.    If not covered by warranty, the cost of transfer case fluid replacement, including parts and labor, is between $250 and $1,500.

**B.    BMW's Knowledge of the Transfer Case Defect**

165.    As early as 2018, and likely earlier, BMW was aware of the Transfer Case Defect, or was reckless in not being aware of the Transfer Case Defect, based on, among others, the following sources:

a.    Pre-release design, manufacturing, engineering, and testing data;

b.    Detailed data gathered by BMW about a large number of Transfer Case Defect repairs by authorized BMW dealers;

c.    Numerous and consistent consumer complaints collected by the National Highway Traffic Safety Administration  ("NHTSA") about the Transfer Case Defect;

31

d.      Service bulletins sent by BMW to its dealerships evincing knowledge of the Transfer Case Defect in the Class Vehicles;

e.      Knowledge BMW had of the large number of replacement transfer cases ordered from BMW;

f.      Numerous and consistent consumer complaints made directly to BMW about the Transfer Case Defect;

g.      Numerous and consistent consumer complaints made on online vehicle owner forums;

h.      BMW service center employees' familiarity with and knowledge of the Transfer Case Defect.

1.      **<u>BMW's Knowledge of the Transfer Case Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data</u>**

166.    During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, BMW necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicle's transfer cases, particularly the basic engineering principles behind the transfer cases' construction and materials, as well as the expected conditions and uses the transfer cases would encounter in ordinary customer use.

167.    An adequate pre-release analysis of the design, engineering, and manufacture of the transfer cases in the Class Vehicles would have revealed to BMW that the transfer cases were defective and would fail when exposed to normal road conditions.

168.    Due to the importance of the transfer case to the drivetrain in all-wheel drive vehicles, manufacturers conduct a wide variety of pre-sale tests to ensure that both the component parts and the vehicle as a whole are adequately designed and manufactured. These tests include:

32

a.      A "worst case parts" test in which, as part of normal automotive engineering practice, the manufacturer tests the maximum and minimum tolerance for components such as clutches by running the transfer case with components on the outlying conditions of the product specification and validating that the control system can overcome these tolerance variations.

b.      Testing of the transfer case as a separate element in a rig or dyno where torque is inputted and the clutches are actuated.

c.      Testing of the full driveline in a dyno to observe interactions between the transfer case and other driveline components such as the rear prop shifts and transmission while gear changes occur.

d.      Testing of the full vehicle with environmental conditions, including test tracks with different friction coefficients applied.

169.    A reasonably prudent vehicle manufacturer should have conducted the above tests, or a substantially similar battery of tests, to ensure that its vehicles' transfer cases were adequate.  Plaintiffs expect discovery to reveal whether BMW performed these tests and knew about the Transfer Case Defect, but chose to sell the Class Vehicles in a defective state, or whether it was reckless in failing to perform these tests.

### 2.      BMW Was Made Directly Aware of the Defect Via Class Member Complaints Collected by NHTSA's Office of Defect Investigations

170.    In addition to complaints made directly to BMW, many Class Vehicle owners lodged complaints about the Transfer Case Defect with NHTSA beginning in 2024.

171.    Federal law requires automakers like BMW to be in close contact with NHTSA regarding potential auto defects, and imposes a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHSTA, including field

reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

172.    Thus, automakers should and do monitor NHTSA databases for consumer complaints regarding automobiles as part of the automakers' on going obligation to identify potential defects in their vehicles, including the failure of components like the transfer case. Indeed, many of the NHTSA complaints also expressly state that BMW was directly informed of the issue.

173.    From its monitoring of the NHTSA database, BMW knew or should have known of the many complaints about the transfer case failure logged by NHTSA, and the content, consistency, and large number of those complaints alerted, or should have alerted, BMW to the Transfer Case Defect.

174.    NHTSA's complaint database is currently publicly available. To the extent that it was not publicly available in previous years, BMW, as a vehicle manufacturer, had contemporaneous and on-going access to the NHTSA consumer complaint data. A sampling of the publicly available complaints lodged with NHTSA to which Plaintiffs have been able to gain access includes the following[2]:

        a.    "BMW jerking and shuttering sensation and rough grinding noise when driving at low speed 2-5 mph and while turning at 2-5 mph. Safety was put at risk with while turning with oncoming traffic and when vehicles directly behind me. The problem has been reproduced and confirmed by the BMW dealership service department. The service department change the left tire and replaced the transfer oil on 05/10/23. This did not solve the problem. The

---

[2] For these and other customer complaints quoted in this Complaint, quotes are left as written, except complaints that were originally in all caps have been changed to standard case. Due to the number of typographical and grammatical errors, [sic] notation has not been used.

vehicle was returned to the dealership for same reason on 7/19/24 and the dealership replaced the right tire. The problem still exists. The vehicle has not been inspected by the manufacturer, police, insurance representative. No warning lamps or messages appear to diagnose the problem." NHTSA database, NHTSA ID No. 11618255, date of incident May 10, 2023.

b.      "How does a known manufacturing defect ( or the factor-filled transfer case oil does not meet BMW specifications.) Not become a safety concern. The wheels have intermittent power from the transfer case. My car showed the concern at 55k miles and the warranty company made me go through another 12 months of the shuddering issue before replacing. When moving from winter to all season tire it became more noticeable. When setting off from a slope my power loss was even greater causing the front wheels to slip from the shuddering power train. This possess a greater risk on loose paving." NHTSA database, NHTSA ID No. 11590613, date of incident May 24, 2024.

c.      "Transfer case causes vehicle to shake when driving straight or turning from a complete stop or low speeds." NHTSA database, NHTSA ID No. 11679631, date of incident March 1, 2025.

d.      "vehicle has been vibrating at low speeds when turning or when backing up. Took vehicle to BMW dealership (BMW of Nashville in Franklin, TN) multiple times during the past 18 months without resolution. On my visit for the same issue this month, dealership finally recognized the issue and said there was a BMW bulletin out about the issue SIB 27 02 20. It is very frustrating that 1. The dealership kept stalling and despite test driving the car with me and feeling the vibration, they kept blaming tires or saying it was normal while the bulletin about the issues was generated in 05.20.2020 2. It cost me over $627 for them to change the transfer case oil to diagnose and repair the issue. I am still in the testing phase after the transfer case oil

change as the vehicle needs to be driven 300+ miles. The dealership and BMW should issue a recall since it is a know issue that the wrong oil was used in the manufacturing process and reimburse the cost charged for diagnostic and transfer case oil replacement. The vehicle is furthermore still under warranty so I should not be paying anything for diagnostics or repairs." NHTSA database, NHTSA ID No. 11655405, date of incident March 20, 2025.

e.      "Without warning the vehicle came to an abrupt stop while going about 25 mph. I got out and checked and noticed a liquid dripping from underneath the front area of the vehicle. Later determined it was the front transfer case. I really would hate to think what could have happened at higher speeds. Again, no warning at all." NHTSA database, NHTSA ID No. 11653163, date of incident March 20, 2025.

f.      "The vehicle experiences a recurring drivetrain shuddering or slipping sensation at low speeds, especially when accelerating from a stop or while cornering. The issue originates from the transfer case, which has been identified as the malfunctioning component. The transfer case was previously serviced according to the manufacturer's official technical bulletin, but the problem returned after the prescribed post-repair evaluation period. The condition compromises vehicle stability and creates a potential safety risk, particularly when merging into traffic, turning at intersections, or navigating tight spaces — where unexpected hesitation or loss of traction can lead to a collision. The issue has been confirmed by authorized dealership technicians, and acknowledged by service personnel as a commonly recurring defect in this vehicle model. The manufacturer has not issued a recall but has documented the issue in an official service bulletin. The component is still installed in the vehicle and available for inspection upon request. There were no dashboard warning lights or fault codes present prior to or during the symptoms. The only observable indication is the physical sensation of

36

shuddering/slipping, which persists intermittently and without system alerts." NHTSA database, NHTSA ID No. 11683156, date of incident August 1, 2025.

g.    "Transfer case and front and rear differentials have failed – bmw claims lifetime fluid which is clearly not accurate." NHTSA database, NHTSA ID No. 11699292, date of incident October 8, 2025.

h.    "Like numerous other BMW owners, my transfer case is failing in my vehicle. It's actively causing jerking/shuddering/locking up at low speeds and while making turns. This poses a significant danger to the driver and passengers in the vehicle, and other drivers as well while turning or trying to merge with traffic. I've brought the car into the dealer had the transfer case fluid changed according to the service bulletin that exists for this problem but it persists. I've brought the vehicle back into the dealer and told that now BMW suggests paying for another fluid change. This is obviously a known problem (thus the service bulletin), it's persisted with models like mine for over 5 years, had cost numerous owners significant amounts of monies out of pocket, and poses a safety risk given the transfer case is a foundational component of these vehicles' drive trains. Finally it's a problem BMW openly admits they caused with improper fluid in the component. I believe the above meets all criteria for a formal recall that BMW should cover (or reimburse) the costs for given their negligence and the risks it poses. Can you confirm why this hasn't risen to a formal recall? And confirm the steps you're actively taking to elevate this to that status with BMW?" NHTSA database, NHTSA ID No. 11697310, date of incident November 3, 2025.

### 3.    **BMW Knew of the Transfer Case Defect as Evidenced by its Own Service Industry Bulletins**

175.    On May 5, 2020, BMW issued SIB 27-02-20 to its dealers within the United States for the first time, advising service technicians about an issue with the transfer case:

"There is a jerking or shuddering during either or both of the following:

- Cornering or accelerating from low speeds

- Driving with low to medium loads[.]

There are no warning lights or Check Control messages."

176.    The bulletin first requires BMW dealerships to perform a tire inspection to check for uneven wear or incorrect fitment of tires. If the tires are not the cause of the shuddering, the bulletin asserts the cause is that "the factory-filled transfer case oil does not met BMW specifications." Regardless, the cause of the problem—whether design of the transfer case or the "factory-filled transfer case oil"_is a result of something solely within the control of BMW, not the owner or lessee.

177.    The bulletin recommends replacing the "transfer case oil" and that after a "run-in period" of up to 125 miles, "the shuddering should diminish…before completely smoothing out."

178.    Over the next several years, BMW issued several revised SIBs, most of which added to the list of affected models. The most recent edition, Revision 5, was published on June 6, 2025. No further revisions have been issued since. It contains the same operative language.

179.    Furthermore, the SIB specifically excludes certified preowned vehicles from warranty coverage: "When applicable to the vehicle being repaired, standalone transfer box/case oil change procedures are not covered or claimable under an active BMW Certified Pre-Owned Program or Extended Service Contract."

### 4.    BMW Knew of the Transfer Case Defect Based on its Receipt of a Large Number of Orders for Replacement Transfer Cases

180.    Upon information and belief, BMW also knew or should have known about the Transfer Case Defect because of the higher than expected number of replacement transfer cases

and replacement transfer case fluid ordered from BMW, which should have alerted BMW that this was a defect affecting a large number and wide range of its vehicles.

181.    Upon information and belief, BMW service centers use BMW replacement parts that they order directly from BMW.  Therefore, BMW would have detailed and accurate data regarding the number and frequency of replacement part orders, including replacement transfer cases and transfer case fluid.  The ongoing high sales of transfer cases and transfer case fluid was (or should have been) known to BMW, and alerted BMW that transfer cases were defective.

182.    Upon information and belief, replacement transfer case fluid and/or replacement transfer cases for some or all of the Class Vehicles are currently backordered or have been backordered, given the high volume of demand for replacement parts due to the Transfer Case Defect. For instance, one absent Class Member was told by a BMW dealership in November of 2025 that the replacement of the transfer case fluid in his BMW X4 would be delayed because the transfer case fluid was on backorder. This parts shortage further substantiates that BMW knows or should know about the existence of the defect.

### 5.    BMW Was Made Directly Aware of the Transfer Case Defect Based on a Large Number of Class Member Complaints to BMW

183.    BMW also knew or should have known about the Transfer Case Defect because numerous consumers complained directly to BMW about the defect.  The large number of complaints, and the consistency of their descriptions of the Transfer Case Defect should have alerted BMW to this serious defect, which impacts a wide range of vehicles.

184.    The full universe of complaints made directly to BMW about the Transfer Case Defect is information presently in the exclusive custody and control of BMW and is not yet available to Plaintiffs prior to discovery.  However, on information and belief, many Class Vehicle owners complained directly to BMW and BMW dealerships about the transfer case

39

failures their vehicles experienced.  For example, some instances of these direct-to-BMW complaints are described in Class Vehicle owners' complaints logged with NHTSA or posted on online vehicle owner forums:

a.      "Failed components 1. oil pump $8769.41 2. Cylinder Head Assembly-Valve Cover $4280.83 3. center console control panel $3051.93 4. transfer case replacement TBD 2019 BMW X5 xDrive40i has multiple major component failures at 70,000 miles. Oil pump failed causing loss of oil-level monitoring. The cylinder head assembly was diagnosed with oil consumption, the transfer case exhibited driveline shuddering, and the center console control panel developed internal electrical faults that affect vital vehicle components. All have been diagnosed by BMW of North Haven, CT. The oil pump and transfer case failures have created potential loss of engine lubrication and vehicle control putting my safety at risk. The oil-level test aborts at 16% making it impossible to verify oil quantity or pressure while driving. The shuddering occurs during low-speed turns and acceleration. BMW North America reviewed my case and approved goodwill coverage for transfer-case fluid change ALL other safety-related repairs have been denied. Supporting BMW Service Bulletins: •SIB 27 02 20: Jerking or Shuddering from Driveline xDrive Transfer Case ATX13-X (faulty factory oil specification). •SIB 11 03 17: N20/N26 Engine Timing Chain and Oil-Pump Drive Chain Warranty Extension (pattern of oil-pump failures in prior engines). •SIB B01 13 23: Front Center Console Cupholder Liquid Ingress (electrical faults from liquid intrusion in 2019–2022 G05 X5). •SIB 65 12 22: Roof-Mounted Antenna Housing Seal Not Adhering (water ingress from shark-fin antenna affecting interior electronics). Note: I paid out of pocket to replace and reprogram theTelematics Communication Box (TCB) due to faulty seal around shark fin. A class action lawsuit is currently in happening for this exact issue in California. These issues are not normal wear and

tear. They represent premature mechanical and electrical failures on a well-maintained vehicle as well as posing a safety risk to me and other drivers." NHTSA database, NHTSA ID No. 11696693, date of incident August 20, 2025.

b.      "Cost me ~$850 on our 2019 to change the fluid. Car has 40k miles on it and the transfer case was shuddering pretty bad when doing slow speed turns. Dealer recommended fluid change and if that didn't fix it would need a new transfer case. Contacted BMW NA about a goodwill case since it only has 40k. They said nope since it was out of warranty. Claimed they were surprised but haven't heard of early tcase failures on the X5 ☺. So if it fails that's going to cost me 6k+ out of pocket. This is on top of the other issues we've had with the car and it's easily the worst BMW I've ever owned (I've owned double digits of them, with 3 new in the past 5 years). I was shopping for a new X5M when this happened as well, but BMW NA's response with this issue and other issues with this car left a sour taste in my mouth. Probably the last BMW I will ever buy. I sued to work for them as a tech as well.. they're not what / who they used to be as a company. Far, far from it." Posted on bimmerpost.com on April 28, 2024.

### 6.      BMW Knew of the Transfer Case Defect Based on Class Member Complaints on Public Online Forums

185.    In addition to complaint made directly to BMW and collected by the NHSTA, many Class Vehicle owners posted complaints about the Transfer Case Defect on public online forums.  The following is a small sampling of such complaints:

a.      "We are seeing a huge amount of transfer case failures. I did my own [fluid change] at 30/60/ and will at 90. I would 1000% suggest doing the fluid if you're planning on keeping the car. I don't recall the price of the fluid, but 1-1.5 hours of labor and 1 liter of oil I would expect (high side) to be $600. Ish." Posted on reddit.com in r/BmwTech on June 5, 2024

b.      "I brought in my X5 and it was confirmed the transfer case is bad. They changed the fluid and put in the miles, still bad. Oddly the symptoms seem even worse after fluid change. So they said transfer case will need to be replaced. Unfortunately the part needs to be ordered from Germany and is on backorder so they told me to take the car back until the part arrives. Anyone have an idea how long it takes to get a part like this from Germany? Dealer had no idea. Also, beyond further destroying the already damaged transfer case, are there any other risks to continuing to drive the X5 with a bad transfer case?" Posted on bimmerpost.com on October 29, 2024.

c.      "Just spent $700 doing a fluid change on our 2022 X5 with 52k miles only to have the issue actually get worse the following day. Quoted $10k to replace the transfer case. First, the Technical Service Bulletin (TSB) recommends the fluid service as a first step in troubleshooting. How would new fluid, oil basically, solve a mechanical issue that occurs only at slow speeds, while turning, in forward or reverse. Basically paid $700 on a different mouthwash because the tooth was cracked. Secondly, why spend $10k to put in the exact same part that failed initially when this is a know issue across BMW (they would not have a TSB is this was not recurring)? There is either a design issue or a controls issue in the drive train programming. BMW needs to issue a recall!" Posted on bimmerpost.com on June 19, 2025.

d.      "Hey All… long time Bimmer guy back to 2006 and <u>DONE</u> with the brand after my 7th and final Bimmer, my 2020 X5 because of transfer case handling by dealer in Warwick, RI and bmwusa. Although discovered while still under warranty and needed replacement they charged me $700 for fluid change which lasted just long enough to put me out of warranty for the real repair. Then after much unnecessary hassle they agreed to charge me 50% of $9400 to replace TC, which is likely what covers their cost! Sad that my love of the

42

brand ended this way. Bmwusa, playing games with your customers isn't smart. BTW, loving my new Tesla! So, thanks." Posted on bimmerpost.com on September 25, 2025.

C.    **BMW's Marketing and Concealment**

186.    BMW manufactured and sold the Class Vehicles with the Transfer Case Defect, while willfully concealing the serious reliability impacts of the defect, as well as the inferior quality and limited longevity of the Class Vehicles' transfer cases.

187.    BMW directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the internet, billboards, print publications, and through other mass media.

188.    BMW regularly releases advertisements and marketing materials touting the reliability of its vehicles, including its xDrive technology.  The following are a few examples of such widely circulated advertisements and marketing materials:

a.    On its website page "What is xDrive?" the section titled "Intelligent All-Wheel Drive" provides: "BMW's xDrive helps you navigate the road on your own terms from hot summer drives to navigating a polar vortex. The xDrive system uses your driving data to automatically relay power to individual wheels for optimal traction and control. Meaning you can still conquer every corner in any season." Under "Dynamic Stability Control," BMW further states: "When you hit a slick stretch of road, your natural instinct is to steer against the slip – and that can make a skid even worse. xDrive's Dynamic Stability Control takes over when traction loss is detected by applying each individual brake as needed in milliseconds. That means more stability for your BMW, and more driving confidence for you." Furthermore, in the section titled "Dynamic Traction Control," it states: "The winter's harshest days can sometimes lead to a situation where you're stuck in snow. Dynamic Traction Control, a part of the Dynamic Stability Control system, provides the necessary wheel spin and brake adjustments to keep you moving

43

forward without losing power. This action keeps you in complete control of your BMW, especially in exceptional situations."

b.      "An adventurer with a strong presence, the #BMW #X3 is ready for every challenge, thanks to BMW xDrive, offering supreme driving comfort both on and off the road." Posted by @BMW on Twitter, March 13, 2018.

c.      In a press release published on June 6, 2018, BMW described the xDrive technology: "The task of maximizing traction, agility and directional stability in the new BMW X5 falls to the latest generation of the BMW xDrive intelligent all-wheel-drive system, which is now able to split drive torque between the front and rear wheels with even greater precision and speed, as the situation demands. For added efficiency, full power can be directed to the rear wheels only in situations where all-wheel drive is surplus to requirements."

d.      In a press release titled "The All-New 2018 BMW X3" published on June 27, 2017, BMW described the xDrive technology as follows: The dynamic handling qualities of the all-new BMW X3 are directly linked to its ideal 50:50 weight distribution, its meticulously honed chassis and xDrive, BMW's Intelligent all-wheel-drive system, which made its debut in 2003 when the first generation of the BMW X3 originally launched. Not only has the system been offering superior grip on slippery surfaces ever since, it has had a beneficial effect on driving dynamics too. This system is networked with the Dynamic Stability Control (DSC) allowing the power split between all four wheels to be constantly varied, providing the handling characteristics for which BMW is renowned."

e.      In a press release titled "The New 2022 BMW X3 and X4" published on June 8, 2021, BMW described the benefits of xDrive once again: "BMW xDrive all-wheel drive makes a significant contribution to the versatile capabilities of the new BMW X3 xDrive30i and

44

BMW X4 models. The latest edition of the system is characterized by reduced weight and optimized internal efficiency. In addition, the precise electronic control of the intelligent all-wheel drive ensures especially sporty power distribution that is typical of the brand. Its rear-wheel bias makes dynamic cornering an exhilarating intense experience. BMW xDrive optimizes both driving stability and traction over varied surface conditions, including rough terrain."

       f.    "Nothing beats the confidence of xDrive on a winter adventure! Where's your favorite destination for a snow drive? ❄ ☐" Posted by @BMW on Twitter, November 28, 2024.

189.    None of BMW's advertisements warned customers that their vehicles were likely to experience failure of the transfer case that would impact their ability to drive the Class Vehicles.

190.    Plaintiffs and Class Members were exposed to BMW's long-term, national multimedia marketing campaign, which focused on the reliability of BMW vehicles. Plaintiffs and Class Members justifiably chose to purchase their Class Vehicles based on BMW's misleading marketing, which concealed the true, defective nature of the Class Vehicles' transfer cases.

191.    Further, BMW knowingly misled Class Members about the defective nature of the Class Vehicles. As detailed above, upon information and belief, BMW has been aware of the Transfer Case Defect since at least 2018 and likely earlier.

192.    Despite BMW's knowledge of the Transfer Case Defect, it told Class Members who complained to customer service about the Transfer Case Defect that it was not aware of any defect, was not responsible for the defect, and that it was not responsible for full reimbursement for the repair.

D.    **Fraudulent Concealment Allegations**

193.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at BMW responsible for disseminating false and misleading marketing materials regarding the Class Vehicles.  BMW necessarily is in possession of all of this information.

194.    Plaintiffs' claims arise out of BMW's failure to disclose and/or fraudulent concealment of the Transfer Case Defect and the issues it causes, and its representations about the world-class quality of the Class Vehicles.

195.    BMW was under a duty to disclose the Transfer Case Defect because it had superior (indeed, exclusive) knowledge of the defect, knew the Transfer Case Defect was a material fact that would affect Plaintiffs' and/or Class Members' decisions to buy or lease Class Vehicles; intentionally concealed the foregoing from Plaintiffs and Class Members; and made partial representations to Plaintiffs and Class Members both prior to and at time of sale and when Plaintiffs and Class Members brought their Class Vehicles in for repair without disclosing its knowledge of the defect to them and while purposefully withholding material facts from Plaintiffs and Class Members that contradicted these representations.

196.    To the extent that Plaintiffs' claims arise from BMW's failure to disclose and/or fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims.  Plaintiffs allege that at all relevant times, including specifically prior to and at the time they purchased their Class Vehicles, BMW knew, or was reckless in not knowing, of the Transfer Case Defect; BMW was under a duty to disclose the Defect; and BMW never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner. Indeed, to the extent BMW has acknowledged any problem with the transfer cases in the Class Vehicles, it has blamed the "factory-filled transfer case oil" rather than the

46

underlying clutch design. Regardless, the cause of the problem is not the result of anything done or not done by the owner: the problem—whether design of the transfer case or the "factory-filled transfer case oil" is a result of something solely within the control of BMW.

197.    Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to BMW:

a.    **Who**: BMW failed to disclose and/or actively concealed the Transfer Case Defect from Plaintiffs and Class Members while simultaneously touting the world-class quality of the Class Vehicles, as alleged in § VI.C.  Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at BMW responsible for such decisions.  However, both representatives of BMW customer service and various BMW-authorized dealerships have denied the existence and prevalence of the Transfer Case Defect when specifically questioned by Class Vehicle owners.

b.    **What**: BMW knew, or was reckless in not knowing, that the Class Vehicles contain the Transfer Case Defect starting no later than 2018, as alleged above in § VI.B.  BMW did not disclose and/or actively concealed the defect and made representations about the world-class quality and other attributes of the Class Vehicles, as specified above in § VI.C.

c.    **When**: BMW did not disclose and/or actively concealed material information regarding the Transfer Case Defect at all times and made representations about the world-class quality of the Class Vehicles, starting no later than 2018, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day, as alleged above in § VI.C.  BMW has never taken any action to inform owners and lessees about the true nature of the defect in Class

Vehicles. And when consumers brought their Vehicles to BMW with defective transfer cases, BMW denied any knowledge of or responsibility for the Transfer Case Defect.

d.    **Where**: BMW did not disclose and/or actively concealed material information regarding the true nature of the Transfer Case Defect in every communication it had with Plaintiffs and Class Members and made representations about the world-class quality of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which BMW disclosed the truth about the Transfer Case Defect in the Class Vehicles to Plaintiffs, Class Members, or the general public. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on BMW's website.

e.    **How**: BMW concealed the Transfer Case Defect from Plaintiffs and Class Members and made representations about the world-class quality of the Class Vehicles. BMW did not disclose and/or actively concealed the truth about the existence and nature of the Transfer Case Defect from Plaintiffs and Class Members at all times, even though it knew about the Transfer Case Defect and knew that information about the Transfer Case Defect would be important to a reasonable consumer, and BMW promised in its marketing materials that Class Vehicles have qualities that they do not have.

f.    **Why**: BMW did not disclose and/or actively concealed material information about the Transfer Case Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the world-class quality, sophistication, and comfort of the Class Vehicles. Had BMW disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and Class Members (all reasonable consumers)

would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

## VII.    TOLLING OF THE STATUTE OF LIMITATIONS|

### A.    Fraudulent Concealment Tolling

198.    BMW has known of the Transfer Case Defect in the Class Vehicles since at least 2018, and certainly well before Plaintiffs and Class Members purchased their Class Vehicles, and yet actively concealed from and/or failed to disclose to Plaintiffs, Class Members, and the public the full and complete nature of the Transfer Case Defect, even when directly asked about it by Plaintiffs and Class Members during communications with BMW, BMW dealerships, and BMW service centers. BMW continues to conceal the defect to this day and has undertaken no steps to inform Plaintiffs or Class Members of it.

199.    Any applicable statute of limitation has been tolled by BMW's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B.    Estoppel

200.    As detailed in Paragraph 195, BMW was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. BMW actively concealed—and continues to conceal—the true character, quality, and nature of the Class Vehicles and knowingly made misrepresentations about the world-class quality of the Class Vehicles.  Plaintiffs and Class Members reasonably relied upon BMW's knowing misrepresentations and active concealment of these facts.  Based on the foregoing, BMW is estoped from relying on any statutes of limitation in defense of this action.

### C.    Discovery Rule

201.    The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Transfer Case Defect.

202.    However, Plaintiffs and Class Members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest—after a professional inspection revealed the defective transfer case. Plaintiffs and Class Members had no reason to know the jerking and shuddering sensation they experienced while driving the Class Vehicles was caused by a defect in the Class Vehicles because of BMW's active concealment of the Transfer Case Defect. In fact, BMW's SIB 27-02-20 directs BMW dealerships to conduct a tire inspection for causes attributable to the owners and lessees, such as unevenly worn or incorrectly fitted tires, as a prerequisite to diagnosing a transfer case issue.  Not only did BMW fail to notify Plaintiffs and Class Members about the Transfer Case Defect, BMW in fact denied any knowledge of or responsibility for the defect when directly asked about it.  Thus Plaintiffs and Class Members were not reasonably able to discover the Transfer Case Defect until after they had purchased their Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Transfer Case Defect caused their transfer cases to fail.

## VIII.    CLASS ALLEGATIONS|

203.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other similarly situated individuals as a nationwide class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), (b)(3), and/or (c)(4).  This action satisfies the numerosity, ascertainability, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

204.    Plaintiffs bring this class action as a nationwide class on behalf of themselves and all other similarly situated members of the proposed class (the "Class Members"), defined as follows:

> All residents of the United States and its territories who are current or former owners and/or lessees of a Class Vehicle. A "Class Vehicle" is a vehicle of any of the following models/model years:

BMW 2019-2025 G01 (X3 Sports Activity Vehicle), G02 (X4 Sports Activity Coupe), G05 (X5 Sports Activity Vehicle), G06 (X6 Sports Activity Coupe), G07 (X7 Sports Activity Vehicle), G12 (7 Series Sedan), G14 (8 Series Convertible), G15 (8 Series Coupe), G16 (8 Series Gran Coupe), G20 (3 Series Sedan), G22 (4 Series Coupe), G23 (4 Series Convertible), G26 (4 Series Gran Coupe), G30 (5 Series Sedan), G32 (640i xDrive Gran Turismo), G42 (2 Series Coupe), G45 (X3 Sports Activity Vehicle), G60 (5 Series Sedan) and G70 (7 Series Sedan) models equipped with an XDrive transfer case.

All Class Vehicles are listed as affected models in BMW's SIB 27-02020. Excluded from the Class are: (1) owners of "BMW M line" vehicles, *i.e.*, the F90 (M5 Sedan), F91 (M8 Convertible), F92 (M8 Coupe), F93 (M8 Gran Coupe), F95 (X5 M Sports Activity Vehicle), F96 (X6 M Sports Activity Vehicle), F97 (X3 M Sports Activity Vehicle), and F98 (X4 M Sports Activity Coupe); (2) employees of BMW AG and BMW NA; (3) any judge assigned to this case and their respective families; (4) government entities; and (5) claims for personal injuries.

### B.    Numerosity and Ascertainability

205.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. Indeed, to date counsel have been contacted by over 400 members of the proposed class reporting the Transfer Case Defect.

206.    Class Members are readily ascertainable via unique VINs on each vehicle, from information and records in BMW's possession, custody, or control, as well as from records kept by state departments of motor vehicles.

### C.    Typicality

207.    The claims of Plaintiffs are typical of the claims of Class Members in that the Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by BMW. Plaintiffs, like all Class Members, were injured by BMW's misconduct

and suffered actual, demonstrable damages in that they purchased or leased a vehicle they would not have purchased, or for which they would have paid less, and incurred or will incur out of pocket costs for services relating to and caused by the Transfer Case Defect and/or have experienced diminished ability to use their Class Vehicles for their intended purpose, and/or have experienced diminution in resale value as a result of the Transfer Case Defect. Furthermore, the factual bases of BMW's misconduct are common to the Plaintiffs and all Class Members and represent a common thread of misconduct resulting in injury to the Plaintiffs and all Class Members.

**D.**    **Adequate Representation**

208.    Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective vehicles.

209.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class, and they have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class.

**E.**    **Predominance of Common Issues**

210.    There are numerous questions of law and fact common to Plaintiffs and Class Members, the answers to which will advance the resolution of the litigation as to all Class Members and which predominate over any individual question. These common legal and factual issues include:

a.    whether the transfer case in the Class Vehicles is defective;

b.    whether and when BMW knew or should have known about the Transfer Case Defect, and, if so, how long BMW knew or should have known of the Defect;

      c.      whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

      d.      whether BMW had and/or has a duty to disclose the defective nature of the Class Vehicle to Plaintiffs and Class Members;

      e.      whether BMW omitted and failed to disclose material facts about the Class Vehicles;

      f.      whether BMW's concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing Class Vehicles;

      g.      whether BMW represented, through its words and conduct, that the Class Vehicle had characteristics, uses, or benefits that they did not actually have;

      h.      whether BMW represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

      i.      whether BMW advertised the Class Vehicles with the intent not to sell them as advertised;

      j.      whether BMW's affirmative misrepresentations about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding, and were therefore fraudulent;

      k.      whether BMW's affirmative misrepresentations about the true defective nature of the Class Vehicles were and are deceptive;

      l.      whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

m.      whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the transfer cases in Class Vehicles are defective and/or not merchantable;

n.      whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

o.      whether BMW should be declared financially responsible for notifying Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Transfer Case Defect in Class Vehicles; and

p.      whether BMW is obligated to inform Class Members of their right to seek full reimbursement for having paid to diagnose and repair the transfer cases at either a BMW dealership or independent mechanic, or for those Class Members who did not retain their Class Vehicles, for the diminution in value of the Class Vehicles upon resale.

**F.      Superiority**

211.    Plaintiffs and Class Members have all suffered and will continue to suffer harm and actual damages as a result of BMW's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

212.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that few if any Class Members could afford to seek legal redress for BMW's misconduct.  Absent a class action, Class Members will continue to incur damages, and BMW's misconduct will continue without remedy.

213.    Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve

the resources of the court and the litigants, and will promote consistency and efficiency of adjudication.

IX.    **CLAIMS FOR RELIEF: NATIONWIDE CLAIMS**

**FIRST CAUSE OF ACTION**
**Breach of Express Warranty, N.J. Stat. Ann. 12A:2-313**
**(this cause of action against BMW NA only)**

214.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

215.    Plaintiffs assert this Count on behalf of themselves and the nationwide Class Members, or, in the alternative, on behalf of the New Jersey State Class.

216.    BMW NA is and was at all relevant times a "merchant" with respect to motor vehicles, and specifically the Class Vehicles under N.J.S. 12A:2-104(1) and a "seller" of motor vehicles, and specifically the Class Vehicles under N.J.S. 2-103(1)(d).

217.    With respect to leases, BMW NA is and was at all relevant times a "lessor" of vehicles under N.J.S. 12A:2A-103(1)(p).

218.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S. 12A:2-105(1) and 2A-103(1)(h).

219.    Plaintiffs and Class Members bought Class Vehicles manufactured, marketed to them, and intended to be purchased by consumers such as them by BMW NA.

220.    BMW NA's express warranties formed a basis of the bargain that was reached when Class Members purchased their Class Vehicles.

221.    As described above, the transfer case in the Class Vehicles is defective.

222.    The Transfer Case Defect was present at the time the Class Vehicles were produced and results in transfer case failure, the early stages of which begin prior to the expiration of the warranty period.

223.    The Transfer Case Defect substantially impairs the use and value of the Class Vehicles to reasonable consumers, including Plaintiffs and Class Members.

224.    BMW NA expressly warranted the Class Vehicles against defect, including the Transfer Case Defect.

225.    Specifically, Class Vehicles were sold to Plaintiffs and Class Members with a new vehicle 48-month and 50,000-mile express warranty.

226.    Pursuant to page 2 of the 2019 New Vehicle Limited Warranty booklet for X model BMW vehicles, BMW NA warranted to the original and each subsequent owner that it "will, without charge for parts and labor (including diagnosis), either repair or replace the defective part(s) using new or authorized remanufactured parts." Upon information and belief, this language is substantively the same in all warranties covering the Class Vehicles.

227.    In addition to any remaining portion of the new vehicle warranty, Class Vehicles that Plaintiffs and Class Members purchased certified pre-owned were covered by the standard BMW Certified Pre-Owned Limited Warranty, which runs for one year and unlimited miles. The Certified Pre-Owned Limited Warranty covers a vehicle's drivetrain (including the transfer case).

228.    BMW NA breached its express warranties by supplying the Class Vehicles to Plaintiffs and Class Members with the Transfer Case Defect.

229.    BMW NA knew of the Transfer Case Defect when it expressly warranted against the defect, wrongfully and fraudulently concealed material facts regarding the defect, and induced Plaintiffs and Class Members to purchase the Class Vehicles under false and/or fraudulent pretenses.

56

230.    BMW NA is obligated, under the terms of its express warranties, to make repairs and/or replacements to permanently correct the Transfer Case Defect for Plaintiffs and Class Members.

231.    BMW NA breached the express warranties to repair the Transfer Case Defect in the Class Vehicles, because it failed to repair the defective transfer cases in the Class Vehicles, such that the vehicles did not exhibit shuddering or jerking, and because it failed to provide to Plaintiff or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it expressly warranted when it sold the Class Vehicles to Plaintiff and Class Members.

232.    The Class Vehicles were sold by BMW with the Transfer Case Defect and should have been repaired under the express warranties because the defect's earliest stages of manifestation occurred within the warranty period. Instead, BMW's SIB 27-02-20 instructed BMW dealerships to check for unevenly worn or improperly fitted tires and/or replace the transfer case fluid. The purported "fixes" suggested by this SIB do not remedy the root cause of the Transfer Case Defect because the clutch design is inherently flawed. Even when BMW replaced transfer case fluid and even transfer cases without charge under warranty, such measures were insufficient to solve the Transfer Case Defect, which inevitably recurred outside of the warranty period because they did not address the defective clutch design.  Plaintiffs gave BMW NA a reasonable opportunity to cure its failures with respect to its warranties, and BMW NA failed to do so in a manner that properly compensated them for the actual economic damages they incurred or will incur as a result of the Transfer Case Defect.

233.    As more fully detailed above, BMW NA was provided with appropriate notice and has been on notice of the Transfer Case Defect and of its brach of express written warranties from various sources.

234.    On October 6, 2025, Plaintiffs, through counsel, sent BMW a letter requesting relief and repair of the defects exhibited in Class Vehicles for Plaintiffs and others similarly situated. Ex. A. In response, BMW did not offer to provide the requested relief.  Instead, its counsel alluded to a possible extension of the warranty that is under consideration, but did not address whether BMW intends to send notice of any extension to all owners and lessees of Class Vehicles and whether BMW intends to compensate Plaintiffs or Class Members for the diminution in value of their vehicles, out-of-pocket costs already paid for replacement transfer case fluid and/or transfer cases, loss of resale value of the Class Vehicle, services performed by independent mechanics, and miscellaneous expenses incurred by Class Members as a result of the Transfer Case Defect (*i.e.*, rental car fees, etc.). Furthermore, absent a design change to the clutch system of the Class Vehicles, the Transfer Case Defect will continue to manifest in the Class Vehicles even if the transfer case is replaced.

235.    As to any Class Members who have not yet sought repairs from BMW, affording BMW NA a reasonable opportunity to cure its breach of written warranties is unnecessary and futile here.  When Plaintiffs and other Class Members provided such notice and sought relief under the warranty, BMW NA refused to provide it, representing that the vehicles were displaying normal "wear and tear," and charged them to replace the defective transfer case fluid and/or transfer cases.

236.    To the extent any express warranties do not by their terms cover the defects alleged in this Complaint, and to the extent the contractual remedy is in any other respect

insufficient to make Plaintiffs and Class Members whole, the warranties fail of their essential purpose and, accordingly, recovery by Plaintiffs and Class Members are not restricted to the promises in any written warranties, and they seek all remedies that may be allowed.

237.    Any attempt by BMW NA to limit or disclaim the express warranties in a manner that would exclude coverage of the Transfer Case Defect is unconscionable as a matter of law because Plaintiffs and Class Members had no meaningful choice in determining the warranties' time limitations, the terms of the warranty unreasonably favored BMW NA over Plaintiffs and Class Members, a gross disparity in bargaining power existed as between BMW NA and Class Members, and the relevant purchase transactions were tainted by BMW NA's knowledge of and failure to disclose and/or active concealment of material facts.

238.    BMW NA knew when it first issued these warranties and imposed limitations that the Transfer Case Defect existed solely as a result of a defect in design, materials, and workmanship, and that the warranties might expire before a reasonable consumer would notice or observe the defect. Plaintiffs and Class Members, on the other hand, had no notice of or ability to detect the Transfer Case Defect prior to purchasing the Class Vehicles. For this reason, the terms of the limited warranty unreasonably favored BMW NA over Plaintiffs and Class Members, and Plaintiffs' and Class Members' acceptance of the warranty's time limitation, to the extent they are found to apply so as to exclude instances where the Transfer Case Defect manifested itself outside of it, was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective. Thus, any such effort by BMW NA to disclaim, or otherwise limit, its liability for the Transfer Case Defect is null and void.

239.    As a direct and proximate result of BMW NA's breach of express warranties, Plaintiffs and Class Members received goods that had substantially impaired value at the point of

sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of needed present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

240.    Plaintiffs seek against BMW NA a) actual damages, b) statutory damages, c) declaratory relief, d) injunctive relief, and e) pre- and post-judgment interest.

241.    In particular, Plaintiffs seek declarations that all Class Vehicles have a defect which results in transfer case failure and that this defect requires disclosure; that BMW must notify owners of the defect; and that any limitations for coverage of this defect in BMW's New Vehicle Limited and Certified Preowned warranties are removed. See *Pella Corp. v. Saltzman*, 606 F.3d 391, 392 (7th Cir. 2010).

<u>SECOND CAUSE OF ACTION</u>
**Breach of Implied Warranty, N.J. Stat. Ann. 12A:2-314**
**(this cause of action against BMW NA only)**

242.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

243.    Plaintiffs assert this Count on behalf of themselves and the nationwide Class Members, or, in the alternative, on behalf of the New Jersey State Class.

244.    BMW NA  is and was at all relevant times a "seller" of motor vehicles under N.J. Stat. Ann. § 12A:2-103(1)(d) and a "merchant" with respect to motor vehicles within the meaning of N.J. Stat. Ann. § 12A:2-104(1).

245.    Plaintiffs and the other Class Members are and were at all relevant times "buyers" with respect to the Class Vehicles under N.J. Stat. Ann. § 12A:2-103(1)(a).

246.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. § 12A:2-105.

247.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to N.J. Stat. Ann. § 12A:2-314.

248.    When it sold the Class Vehicles, BMW NA extended an implied warranty to Class Members that the subject vehicles were merchantable and fit for the ordinary purpose for which such goods were sold and free of material defects.

249.    Persons who purchased a Class Vehicle from BMW NA are entitled to the benefit of their bargain: a vehicle with a transfer case that has been properly designed and manufactured and that should never fail or require replacement.

250.    BMW NA breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use; and (2) not of a merchantable quality and free of material defects.

251.    In particular, the Class Vehicles are not fit for ordinary use because they do not perform their function as an all-wheel-drive vehicle; they jerk and shudder during ordinary vehicle use, such as when turning and shifting gears; and they are equipped with transfer cases and transfer case fluid which require replacement, even though such services should never be necessary during the life of the vehicle.

252.    Plaintiffs and Class Members are in privity of contract with BMW of NA because they purchased the Class Vehicles under warranty through authorized BMW dealerships that are agents of BMW NA for the purposes of selling and servicing BMW vehicles in the United States.

253.    To the extent that Plaintiffs and Class Members lack privity of contract with BMW NA, no privity is required because Plaintiffs and Class Members were intended third-party beneficiaries of the transactions between BMW NA and its network of authorized dealerships.

BMW NA's authorized dealers were not intended to be the ultimate consumers of the Class Vehicles. Rather, the warranty agreements were expressly designed for and intended to benefit the ultimate purchasers of the Class Vehicles.

254.    Plaintiffs provided any notice that could possibly have been required. In particular, on October 6, 2025, Plaintiffs, through counsel, sent BMW a letter requesting relief and repair of the defects exhibited in Class Vehicles for Plaintiffs and others similarly situated. Ex. A. In response to this letter, BMW did not offer to provide the requested relief. Instead, its counsel alluded to a possible extension of the warranty that is under consideration, but did not address whether BMW intends to send notice of any extension to all owners and lessees of Class Vehicles and whether BMW intends to compensate Plaintiffs or Class Members for the diminution in value of their vehicles, out-of-pocket costs already paid for replacement transfer case fluid and/or transfer cases, loss of resale value of the Class Vehicle, services performed by independent mechanics, and miscellaneous expenses incurred by Class Members as a result of the Transfer Case Defect (*i.e.*, rental car fees, etc.). Furthermore, absent a design change to the clutch system of the Class Vehicles, the Transfer Case Defect will continue to manifest in the Class Vehicles even if the transfer case is replaced.

255.    As a direct and proximate result of BMW NA's breach of the implied warranty of merchantability, Plaintiffs and Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, and diminution of resale value, in an amount to be determined at trial.

256.    Plaintiffs seek against BMW NA a) actual damages, b) statutory damages, c) declaratory relief, d) injunctive relief, and e) pre- and post-judgment interest.

## THIRD CAUSE OF ACTION
### Violations of New Jersey's Consumer Fraud Act
### N.J. Stat. Ann. §§ 56:8-1, *et seq.*

257.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

258.    Plaintiffs assert this Count on behalf of themselves and the nationwide Class Members, or, in the alternative, on behalf of the New Jersey State Class Members.

259.    Plaintiffs, Class Members, BMW NA, and BMW AG are each a "person" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"). *See* N.J. Stat. Ann. § 56:8-1(d).

260.    The Class Vehicles and the defective transfer cases installed in them are "merchandise" within the meaning of the New Jersey CFA. *See* N.J. Stat. Ann. § 56:8-1(c).

261.    The New Jersey CFA prohibits unfair trade practices, encompassing "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." *See* N.J. Stat. Ann. § 56:8-2. The New Jersey CFA also prohibits schemes not to sell items as advertised. *See* N.J. Stat. Ann. § 56:8-2.2.

262.    At all relevant times material hereto, BMW conducted trade and commerce in and from New Jersey.

263.    The New Jersey CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes. *See* N.J. Stat. Ann. § 56:8-2.13.

264.    BMW has engaged in unlawful, deceptive practices in the sale of the defective transfer cases in the Class Vehicles as alleged in more detail elsewhere herein, including: (1)

selling the Class Vehicles despite knowing that the transfer cases were prone to failure; (2) refusing to fully reimburse Plaintiff and Class Members for the replacement of their transfer cases and related costs; and (3) failing to disclose and/or concealing this known defect.

265.    BMW knew of the Transfer Case Defect prior to the sale of the Class Vehicles, and likely as early as 2018, through sources such as those identified in § VI.B.

266.    BMW knowingly and intentionally omitted and failed to disclose material facts to Plaintiffs and Class Members with respect to the Transfer Case Defect, including the fact that, with normal use, the transfer case would fail and/or malfunction as described elsewhere herein, and/or denying and/or misleading them as to the true cause of the Transfer Case Defect.

267.    BMW intended to deceive Plaintiffs and Class Members and intended that Plaintiffs and Class Members rely on BMW's misrepresentations, omissions, and acts of concealment, so that Plaintiffs and Class Members would purchase the Class Vehicles equipped with defective transfer cases at a substantial out-of-pocket cost to them.

268.    BMW's conduct as described herein is unethical, oppressive, or unscrupulous in that BMW often misled, denied, and dissuaded knowledge, responsibility, warranty obligations, and relief when complaints were made to them.  BMW frequently blamed Plaintiffs and Class Members for the Transfer Case Defect, labeling the condition normal "wear and tear."  BMW refused to fully reimburse Class Members and Plaintiffs for the cost of replacing their defective transfer cases and other components damaged due to the Transfer Case Defect.

269.    Plaintiffs and Class Members, like all objectively reasonable consumers, did not expect the transfer cases in their vehicles to fail, even with regular maintenance.

270.    BMW had a duty to disclose the Transfer Case Defect to Plaintiffs and Class Members, as well as the associated costs to replace the defective transfer cases, because it:

    a.      Knew the Transfer Case Defect was a material fact that would affect Plaintiffs' or Class Members' decisions to buy or lease Class Vehicles;

    b.      Possessed exclusive knowledge of the risks posed by the foregoing;

    c.      Intentionally concealed the foregoing from Plaintiffs; and/or

    d.      Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and Class Members that contradicted these representations.

271.    Had BMW disclosed all material information regarding the defective transfer cases to Plaintiffs and Class Members, they would not have purchased their Class Vehicles or would have paid less for them.

272.    Plaintiffs provided any notice that could possibly have been required. In particular, on October 6, 2025, Plaintiffs, through counsel, sent BMW a letter requesting relief and repair of the defects exhibited in Class Vehicles for Plaintiffs and others similarly situated. Ex. A. In response to this letter, BMW did not offer to provide the requested relief. Instead, its counsel alluded to a possible extension of the warranty that is under consideration, but did not address whether BMW intends to send notice of any extension to all owners and lessees of Class Vehicles and whether BMW intends to compensate Plaintiffs or Class Members for the diminution in value of their vehicles, out-of-pocket costs already paid for replacement transfer case fluid and/or transfer cases, loss of resale value of the Class Vehicle, services performed by independent mechanics, and miscellaneous expenses incurred by Class Members as a result of the Transfer Case Defect (*i.e.*, rental car fees, etc.). Furthermore, absent a design change to the clutch system of the Class Vehicles, the Transfer Case Defect will continue to manifest in the Class Vehicles even if the transfer case is replaced.

273.    Furthermore, BMW has long been on notice of the Transfer Case Defect and of its violation of the New Jersey CFA from various sources.

274.    Plaintiffs and Class Members suffered ascertainable loss as a direct result of BMW's misrepresentations and omissions of material information.  Plaintiffs and Class Members received goods that had substantially impaired value at the point of sale, and have suffered incidental, consequential, and other actual damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

275.    Plaintiffs seek an order enjoining BMW's unfair, unlawful, and/or deceptive practices and declaratory relief, as well as actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit.  *See* N.J. Stat. Ann. § 56:8-19.  In addition, Plaintiffs and Class Members seek an award of punitive damages as to BMW NA only.

### FOURTH CAUSE OF ACTION
### Fraud by Concealment and/or Nondisclosure

276.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

277.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, as there are no true conflicts among various states' laws of fraudulent concealment with respect to this factual context.

278.    In the alternative, Plaintiffs bring this claim on behalf of the State Classes, which can be subdivided into a small number of groups to reflect any material differences in the law with respect to Plaintiffs' claims.

279.    BMW is liable for both fraudulent concealment and non-disclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

280.    BMW concealed and suppressed material facts concerning the Transfer Case Defect, which causes the transfer case on the Class Vehicles to fail and require replacement. BMW knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Transfer Case Defect prior to purchasing or leasing the vehicles. BMW furthered and relied upon this lack of disclosure to encourage Class Members to pay significant sums out of pocket to replace their defective transfer cases, which BMW falsely represented as being damaged as the result of normal "wear and tear," all the while concealing the true nature of the Defect from Plaintiffs and Class Members. When Plaintiffs and Class Members complained of the Defect, BMW further denied the very existence the Transfer Case Defect.

281.    BMW committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers of BMW vehicles that the Class Vehicles were high-quality, long-lasting, warranted, and reliable vehicles, and concealed the information in order to prevent harm to BMW's and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase the Class Vehicles.

282.    Plaintiffs and Class members, directly or indirectly, were exposed to BMW's advertisements and promotional materials prior to purchasing or leasing their Class Vehicles. The misleading statements about Class Vehicles' reliability, as well as BMW's omission of the truth about the defective nature of the Class Vehicles' transfer cases, influenced Plaintiffs and

Class Members' decisions to purchase or lease Class Vehicles.  If BMW had instead chosen to disclose the truth, Plaintiffs and Class Members would have seen those disclosures.  Indeed, Plaintiffs and Class Members would have had multiple opportunities to receive information about the defect if BMW chose to disclose it, including at dealerships, on BMW's website, in radio or television advertisements, brochures, press releases or in other promotional materials, as well as in consumer forums and reviews.

283.    On information and belief, BMW has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding the Transfer Case Defect in the Class Vehicles.  BMW continues to deny the existence of the Transfer Case Defect.

284.    BMW had a duty to disclose the Transfer Case Defect in the Class Vehicles because:

a.    BMW had exclusive and superior knowledge of and access to facts about the defect, and such facts were not know to or reasonably discoverable by Plaintiffs;

b.    BMW made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, longevity, and usability; and

c.    BMW made partial and incomplete disclosures when faced with complaints regarding the Transfer Case Defect, which further misled consumers and concealed the true cause of the symptoms complained of.  As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase and then again when Class Members complained of the failure of their transfer cases to BMW.

285.    Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Transfer Case Defect that BMW failed to disclose and paid out-of-pocket to replace the defective transfer case or experienced significant diminution of their Class Vehicle's value.  Had they been aware of the concealed Transfer Case Defect that existed in the Class Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased them at all.

286.    Plaintiffs and Class Members suffered ascertainable loss as a direct result of BMW's misrepresentations and omissions of material information.  Plaintiffs and Class Members received goods that had substantially impaired value at the point of sale, and have suffered incidental, consequential, and other actual damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

287.    BMW's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and Class Members' rights and well-being to enrich BMW.  BMW's conduct warrants an assessment of punitive damages against BMW NA in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

288.    Plaintiffs and Class Members are entitled to recover damages because they received goods that had a substantially impaired value at the point of sale, as well as actual damages, together with appropriate penalties, including but not limited to attorneys' fees, and

costs of suit. In addition, Plaintiffs and Class Members seek an order enjoining BMW's unfair, unlawful, and/or deceptive practices, as well as declaratory relief.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment

289.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

290.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, as there are no true conflicts among various states' laws of unjust enrichment with respect to this factual context.

291.    In the alternative, Plaintiffs bring this claim on behalf of the State Classes, which can be subdivided into a small number of groups to reflect any material differences in the law with respect to Plaintiffs' claims.

292.    BMW has been unjustly enriched by the Plaintiffs and Class Members through Plaintiffs' and Class Members' purchasing and/or leasing Class Vehicles from BMW and purchasing replacement parts and services from BMW that Plaintiffs and Class Members would not have purchased but for the Transfer Case Defect and BMW's concealment of the same.

293.    Specifically, BMW receives and appreciates a direct financial benefit from the sale of its Class Vehicles to end consumers, including Plaintiffs and Class Members.  BMW primarily sells the Class Vehicles to dealerships, which then sell them to end consumers.  The sale of BMW's Class Vehicles to end consumers results in revenues which are either paid directly to BMW or used by the intermediaries to pay BMW for its vehicles.

294.    Plaintiffs and Class Members unknowingly conferred a benefit on BMW of which BMW had knowledge, since BMW was aware of the defective nature of its Class Vehicles' transfer cases and the resultant transfer case failure, but failed to disclose this knowledge and

misled Plaintiffs and the Class Members regarding the nature and quality of the subject Class Vehicles while profiting from this deception.

295.    The circumstances are such that it would be inequitable, unconscionable, and unjust to permit BMW to retain the benefit of revenue that it unfairly obtained from Plaintiffs and Class Members.  This revenue included the premium price Plaintiffs and Class Members paid for the Class Vehicles and the unreimbursed cost of the parts and services bought from BMW used to replace the defective transfer cases and to remedy other damage caused by the Transfer Case Defect.

296.    Plaintiffs and the other members of the Class, having been damaged by BMW's conduct, are entitled to recover or recoup damages and/or restitution as a result of the unjust enrichment of BMW to their detriment.

## X.    CLAIMS FOR RELIEF: PLAINTIFFS' STATES OF PURCHASE|

### A.    California

### SIXTH CAUSE OF ACTION
**Violation of the California Consumers Legal Remedies Act**
**Cal. Civ. Code §§ 1750, *et seq.***
**(on behalf of the California State Class)**

297.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

298.    Plaintiff Zhargal Dampilon brings this claim on behalf of himself and the California State Class against all Defendants.

299.    Plaintiff and members of the California State Class were deceived by BMW's failure to disclose that the Class Vehicles were equipped with transfer cases prone to failure and were therefore not fit for the ordinary purpose for which vehicles are used.

300.    BMW engaged in unfair or deceptive acts or practices when, in the course of its business it, among other acts and practices, knowingly made materially incomplete representations as to the characteristics, uses, and benefits of the Class Vehicles.

301.    In the various channels of information through which BMW sold and marketed Class Vehicles, BMW failed to disclose material information concerning the Class Vehicles. BMW had a duty to disclose the Transfer Case Defect because, as detailed above, (a) BMW knew about the susceptibility of the transfer cases to failure; (b) BMW had superior knowledge of material facts not known to the general public or the California State Class Members; (c) BMW actively concealed material facts concerning the Transfer Case Defect from the general public and Plaintiff and California State Class Members; and (d) BMW made partial representations about the Class Vehicles that were misleading because they did not disclose the full truth. As detailed above, BMW knew the information concerning the defect at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

302.    BMW intended for Plaintiff and California State Class Members to rely on it to provide adequately designed and adequately manufactured automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

303.    BMW intentionally failed or refused to disclose the defect to consumers.

304.    BMW's conduct and deceptive omissions were intended to induce Plaintiff and California State Class Members to believe that the Class Vehicles were adequately designed and adequately manufactured automobiles.

305.    BMW's conduct constitutes unfair acts or practices as defined by the California Consumers Legal Remedies Act (the "CLRA").

306. Plaintiff and other California State Class Members have suffered injury in fact and actual damages resulting from BMW's material omissions.

307. BMW is on notice of the issues raised in this count and this Complaint by way of Plaintiff's notice letter sent to BMW in accordance with Cal. Civ. Code § 1782(a) of the CLRA, notifying BMW of its alleged violations of Cal. Civ. Code § 1770(a) and demanding that BMW correct or agree to correct the actions described therein within thirty (30) days of the notice letter. BMW's response, sent through counsel on November 17, 2025, that it is now considering extending the warranty for the Class Vehicles' transfer cases is inadequate in that, even if BMW ultimately extends the warranty, it gives no indication that BMW intends to send notice of any extension to all owners and lessees of Class Vehicles or compensate Plaintiffs and Class Members for the diminution in value of their vehicles, out-of-pocket costs already paid for replacement transfer case fluid and/or transfer cases, loss of resale value of the Class Vehicles, services performed by independent mechanics, and miscellaneous expenses incurred by Class Members as a result of the Transfer Case Defect (*i.e.*, rental car fees, etc.). Furthermore, absent a design change to the clutch system of the Class Vehicles, the Transfer Case Defect will continue to manifest in the Class Vehicles even if the transfer case is replaced.

308. Plaintiff and the California State Class seek actual damages, punitive damages, an order enjoining BMW's unfair or deceptive acts or practices, equitable relief, attorneys' fees and costs, and any other just and proper relief available under Cal. Civ. Code § 1780(a) of the CLRA. Furthermore, on behalf of those California State Class Members who qualify as a "senior citizen" or "disabled person" as defined by subdivisions (f) and (g) of Cal. Civ. Code § 1761 of the CLRA, Plaintiff seeks additional damages pursuant to Cal. Civ. Code § 1780(b) of the CLRA.

**SEVENTH CAUSE OF ACTION**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(on behalf of the California State Class)**

309.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

310.    Plaintiff Zhargal Dampilon brings this claim on behalf of himself and the California State Class against all Defendants.

311.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." BMW has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the Unfair Competition Law ("UCL").

312.    BMW's knowing and intentional conduct, as described herein, constitutes unlawful, fraudulent, and unfair business acts and practices in violation of the UCL. BMW violated the UCL in at least the following ways:

a.    by knowingly and intentionally failing to disclose to Plaintiff and California State Class Members material information about the Transfer Case Defect while obtaining money from the California State Class Members;

b.    by misrepresenting the Class Vehicles as possessing functional and defect-free transfer cases; and

c.    by violating the other California laws alleged herein, including the False Advertising Law, California Commercial Code, and Song-Beverly Consumer Warranty Act.

313.    BMW's acts and practices deceived Plaintiff and are likely to deceive the public. In failing to disclose the Transfer Case Defect and suppressing other material facts from Plaintiff and Class Members, BMW breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiff and Class Members.

314.    BMW's misrepresentations and omissions alleged herein caused Plaintiff and the California State Class Members to make their purchases or leases of their Class Vehicles. BMW's concealed facts, omissions, and false or misleading representations to Plaintiff and the Class Members, as alleged herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase or lease the Class Vehicles or to pay a lesser price.

315.    Absent those misrepresentations and omissions, Plaintiff and California State Class Members would not have purchased or leased these Class Vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not have the Transfer Case Defect.

316.    Accordingly, Plaintiff and California State Class Members have suffered ascertainable loss and actual damages as a direct and proximate result of BMW's misrepresentations and their concealment of and failure to disclose material information.

317.    BMW's violations present a continuing risk to Plaintiff and California State Class Members, as well as to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

318.    The injuries suffered by Plaintiff and Class Members are not outweighed by any potential countervailing benefit to consumers or to competition, nor are the injuries that Plaintiff and California State Class Members suffered injuries that could have been reasonably avoided.

319.    Plaintiff pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiff has no adequate remedy at law, including for the future unlawful acts, methods, or practices as set forth above absent an injunction, and Plaintiff and the California State Class Members lack an adequate remedy at law to recover or fully recover amounts and benefits subject to restitution pursuant to this cause of action and to obtain or fully obtain the requested injunctive relief pursuant to this cause of action.

320.    Moreover, BMW's alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

321.    Plaintiff requests that this Court enter such orders or judgments as may be necessary to enjoin BMW from continuing its unlawful, and/or deceptive practices and to restore to members of the California State Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

322.    Plaintiff, on behalf of themselves and the California State Class, further seeks an award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

**EIGHTH CAUSE OF ACTION**
**Violations of the California False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(on behalf of the California State Class)**

323.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

324.    Plaintiff Zhargal Dampilon brings this claim on behalf of himself and the California State Class against all Defendants.

325.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to

76

induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

326.    BMW caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to BMW, to be untrue and misleading to consumers, including California State Class Members.

327.    BMW has violated Section 17500 because the misrepresentations and omissions regarding the reliability and functionality of Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

328.    Plaintiff and the other California State Class Members have suffered an injury in fact, including the loss of money or property, as a result of BMW's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, the California State Class relied on the misrepresentations and/or omissions of BMW with respect to the performance and reliability of the Class Vehicles. BMW's representations turned out not to be true because the Class Vehicles are distributed with faulty and defective transfer cases.

329.    All of the wrongful conduct alleged herein occurred in the conduct of BMW's business. BMW's wrongful conduct is part of a pattern or generalized course of conduct that was perpetuated, both in the State of California and nationwide.

330.     The California State Class requests that this Court enter such orders or judgments as may be necessary to enjoin BMW from continuing their unfair, unlawful, and/or deceptive practices and to restore to the California State Class any money BMW acquired by false advertising, including restitution and/or restitutionary disgorgement, and for other such relief set forth below.

### NINTH CAUSE OF ACTION
**Violation of Song-Beverly Consumer Warranty Act, Breach of Implied Warranty**
**Cal. Civ. Code §§ 1790, *et seq.***
**(on behalf of the California State Class)**

331.     Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

332.     Plaintiff Zhargal Dampilon brings this claim on behalf of himself and the California State Class against all Defendants.

333.     Plaintiff and members of the California State Class who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

334.     The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code. § 1791(a).

335.     BMW is the "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

336.     BMW impliedly warranted to the Plaintiff and the other members of the California State Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

337.     Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

a.      Pass without objection in the trade under the contract description.

b.      Are fit for the ordinary purposes for which such goods are used.

c.      Are adequately contained, packaged, and labeled.

d.      Conform to the promises or affirmations of fact made on the container or label.

338.    The Class Vehicles would not pass without objection in the trade because they share a common defect in design or manufacturing resulting in failure of the transfer case.

339.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the fact that they are defective.

340.    In the various channels of information through which BMW sold and marketed Class Vehicles, BMW failed to disclose material information concerning the Class Vehicles, which it had a duty to disclose. BMW had a duty to disclose the defect because, as detailed above: (a) BMW knew about the defect; (b) BMW had exclusive knowledge of material facts not known to the general public or the California State Class Members; (c) BMW actively concealed material facts from the general public and California State Class Members concerning the Class Vehicles' true reliability and performance; and (d) BMW made partial representations about the Class Vehicles that were misleading because they did not disclose the full truth. As detailed above, BMW knew the information concerning the Transfer Case Defect at the time of advertising and selling the Class Vehicles, all of which was intended to induce consumers to purchase the Class Vehicles.

341.    BMW breached the implied warranty of merchantability by manufacturing and selling Class Vehicles that are defective. Furthermore, this defect has caused members of the

California State Class to not receive the benefit of their bargain and has caused the Class Vehicles to depreciate in value.

342.    Plaintiff and members of the California State Class have been damaged as a result of the diminished value of BMW's products.

343.    Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiff and other members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

344.    Under Cal. Civ. Code § 1794, Plaintiff and other members of the California State Class are entitled to costs and attorneys' fees.

**TENTH CAUSE OF ACTION**
**Violation of the Song-Beverly Consumer Protection Act, Breach of Express Warranty**
**Cal. Civ. Code §§ 1790, *et seq.***
**(on behalf of the California State Class)**

345.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

346.    Plaintiff Zhargal Dampilon brings this claim on behalf of himself and the California State Class against all Defendants.

347.    Plaintiff and members of the California State Class who purchased Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

348.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code. § 1791(a).

349.    BMW is the "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

350.    BMW made express warranties to members of the California State Class within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

351.    As set forth above in detail the Class Vehicles are inherently defective in that they contain a transfer case prone to failure. This defect substantially impairs the use and value of the Class Vehicles to reasonable consumers.

352.    As a result of BMW's breach of its express warranties, members of the California State Class received goods whose defect substantially impairs their value to Plaintiff and the other members of the California State Class. Plaintiff and members of the California State Class have been damaged as a result of, *inter alia*, the lesser value of BMW's products.

353.    Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, Plaintiff and members of the California State Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

354.    Pursuant to Cal. Civ. Code § 1794, Plaintiff and the other members of the California State Class are entitled to costs and attorneys' fees.

**B.    Illinois**

**ELEVENTH CAUSE OF ACTION**
**Violations of Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.***
**(on behalf of the Illinois State Class)**

355.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

356.    Plaintiff  Kevin Finley brings this claim on behalf of himself and the Illinois State Class against all Defendants.

357.    BMW NA and BMW AG are each a "person" as defined by the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDBPA"). 815 Ill. Comp. Stat. Ann. § 505/1(1)(c).

358.    Plaintiff and Illinois State Class Members are "consumers" within the meaning of the Illinois CFDBPA. 815 Ill. Comp. Stat. Ann. § 505/1(1)(e).

359.    The purchase of Class Vehicles by Plaintiff and Illinois State Class Members constituted "commerce" as defined by the Illinois CFDBPA. 815 Ill. Comp. Stat. Ann. § 505/1(1)(e).

360.    The Illinois CFDBPA declares "[u]nfair methods of competition and unfair or deceptive acts or practices… in the conduct of any trade or commerce" to be unlawful, including but not limited to "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 Ill. Comp. Stat. Ann. § 505/2.

361.    By failing to disclose the defective nature of the Class Vehicles to Plaintiff and Illinois State Class Members, BMW violated the Illinois CFDBPA, because BMW misrepresented or omitted material facts regarding the Class Vehicles with intent that Plaintiff and Illinois State Class Members rely upon the omission of such material facts.

362.    BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

363.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a material defect that would cause them to fail and render the Class Vehicles unsuitable for their intended use.

364.    By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case defect in its Class Vehicles. Furthermore, BMW actively concealed this defect from consumers by denying the existence of the defect to Illinois State Class Members who contacted BMW about their defective transfer cases and failed to offer to reimburse Illinois State Class Members for the cost of replacing their defective transfer cases.

365.    BMW was under a duty to Plaintiff and Illinois State Class Members to disclose the Transfer Case Defect, as well as the costs of replacing the defective transfer case and returning the Class Vehicles to a reliable condition because BMW:

a.    Knew the Transfer Case Defect was a material fact that would affect Plaintiff's or Illinois State Class Members' decision to buy or lease Class Vehicles;

b.    Possessed exclusive knowledge of the risks posed by the foregoing;

c.    Intentionally concealed the foregoing from Plaintiff and Illinois State Class Members; and/or

d.    Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and Illinois State Class Members that contradicted these representations.

366.    BMW knew or should have known that its conduct violated the Illinois CFDBPA.

367.    In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure present in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

368.    The facts BMW concealed from Plaintiff and Illinois State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the

Transfer Case Defect to be an undesirable quality, as Plaintiff and Illinois State Class Members did. Had Plaintiff and Illinois State Class Members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased a Class Vehicle, or would have paid less for them.

369.    Plaintiff and Illinois State Class members, like all objectively reasonable consumers, did not expect the transfer cases of their vehicles to fail.

370.    As a result of BMW's misconduct, Plaintiff and Illinois State Class Members have been harmed and suffered actual damages including in that the Class Vehicles have transfer cases that are likely to fail, making the Class Vehicles unsuitable for their intended purpose.

371.    As a direct and proximate result of BMW's unfair or deceptive acts or practices, Plaintiff and Illinois State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, and inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

372.    BMW's violations present a continuing risk to Plaintiff and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

373.    Plaintiff and Illinois State Class Members are entitled to equitable relief.

374.    Thus, Plaintiff and Illinois State Class Members seek an order enjoining BMW's unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages,

attorneys' fees and expenses, and treble damages as to both BMW NA and BMW AG and

punitive damages as to BMA NA only, as permitted under the Illinois CFDBPA.

## TWELFTH CAUSE OF ACTION
**Violations of Illinois's Uniform Deceptive Trade Practices Act**
**815 Ill. Comp. Stat. Ann. §§ 505/10, *et seq.***
**(on behalf of the Illinois State Class)**

376.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

377.    Plaintiff Kevin Finley brings this claim on behalf of himself and the Illinois State

Class against all Defendants.

378.    BMW, Plaintiff, and Illinois State Class Members are each a "person" within the

meaning of Illinois's Uniform Deceptive Trade Practices Act ("Illinois UDTPA"). 815 Ill.

Comp. Stat. Ann. § 510/1(5).

379.    The Illinois UDTPA prohibits "deceptive trade practices" which include

representing "that goods or services are of a particular standard, quality, or grade or that goods

are of a particular style or model, if they are not," representing "that goods or services have

sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not

have," and advertising "goods or services with the intent not to sell them as advertised." 815 Ill.

Comp. Stat. Ann. § 510/2.

380.    By failing to disclose the defective nature of the Class Vehicles to Plaintiff and

Illinois State Class Members, BMW engaged in deceptive trade practices in violation of the

Illinois UDTPA, because BMW represented that the Class Vehicles had characteristics and

benefits that they do not have, and represented that the Class Vehicles were of a particular

standard, quality, or grade when they were of another. *See* 815 Ill. Comp. Stat. Ann. §§ 510/2(5),

(7), & (9).

381.    BMW advertised the Class Vehicles with the intent not to sell them as advertised, in violation of the Illinois UDTPA. *See* 815 Ill. Comp. Stat. Ann. § 510/2(9).

382.    BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

383.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were not suitable for their intended use.

384.    By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW actively concealed these defects from consumers by denying the existence of the defects to Illinois State Class Members who contacted BMW about the failure of their transfer cases and failing to offer Illinois State Class Members full reimbursement for the replacement of their defective transfer cases.

385.    BMW was under a duty to Plaintiff and Illinois State Class Members to disclose the Transfer Case Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Transfer Case Defect because BMW:

a.    Knew the Transfer Case Defect was a material fact that would affect Plaintiff's or Illinois State Class Members' decisions to buy or lease Class Vehicles;

b.    Possessed knowledge of the risks posed by the foregoing;

c.    Intentionally concealed the foregoing from Plaintiff and Illinois State Class Members; and/or

d.    Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and Illinois State Class Members that contradicted these representations.

386.    Despite possessing information to the contrary, BMW failed to disclose and actively concealed the Transfer Case Defect while continuing to market the Class Vehicles as world-class and reliable. The deception made reasonable consumers believe that Class Vehicles were of high-quality, and designed and made by a company that stood behind its vehicles once they were on the road.

387.    BMW knew or should have known that its conduct violated the Illinois UDTPA. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

388.    The facts that BMW concealed from Plaintiff and Illinois State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the Transfer Case Defect to be an undesirable quality, as Plaintiff and Illinois State Class Members did. Had Plaintiff and Illinois State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

389.    Plaintiff, like all objectively reasonable consumers, did not expect the transfer case in his Class Vehicle to fail and require significant, costly repairs.

390.    As a direct and proximate result of BMW's misconduct, Plaintiff and Illinois State Class Members received goods that had substantially impaired value at the point of sale,

and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

391.    BMW's violations present a continuing risk to Plaintiff and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

392.    As a direct and proximate result of BMW's violations of the Illinois UDPTA, Plaintiff and Illinois State Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

393.    Plaintiff seeks a) actual damages, b) statutory damages, c) exemplary and/or punitive damages, d) declaratory relief, e) injunctive relief, f) pre- and post-judgment interest, g) attorneys' fees and costs, and h) any other just and proper relief available under the Illinois UDTPA. *See* 815 Ill. Comp. Stat. Ann. § 510/3.

    **C.**    <u>**Ohio**</u>

**THIRTEENTH CAUSE OF ACTION**
**Violations of the Ohio Consumer Sales Practices Act**
**Ohio Rev. Code §§ 1345.01 *et seq.***
**(on behalf of the Ohio State Class)**

395.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

396.    Plaintiffs Richard Grad and Thomas Kavanaugh bring this claim on behalf of themselves and the Ohio State Class against all Defendants.

397.    Defendants, Plaintiffs, and Ohio State Class members are "persons" within the meaning of Ohio Rev. Code § 1345.01(B). Defendants are a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

398.    Plaintiffs and the Ohio State Class are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Class Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

399.    Ohio Rev. Code § 1345.02 prohibits unfair or deceptive acts or practices in connection with a consumer transaction. The Ohio Consumer Sales Practices Act ("Ohio CSPA") prohibits a supplier from (i) representing that goods have characteristics, uses or benefits which the goods do not have; (ii) representing that their goods are of a particular quality or grade that the product is not; and (iii) representing that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.

400.    By failing to disclose the defective nature of the Class Vehicles to Plaintiffs and Ohio State Class Members, BMW engaged in deceptive trade practices in violation of the Ohio CPSA by: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

401.    BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

402.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were not suitable for their intended use.

403.    By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW actively concealed these defects from consumers by denying the existence of the defects to Ohio State Class Members who contacted BMW about failure of their transfer cases and failing to offer Ohio State Class Members full reimbursement for the replacement of their defective transfer cases.

404.    Defendants knew or should have known that their conduct violated the Ohio CSPA.

405.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the types of acts and omissions of Defendants in this Complaint—including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a substantial defect—constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

a.    *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b.    *State ex rel. Betty D. Montgomery v. Ford Motor Co*. (OPIF #10002123);

c.    *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc*. (OPIF #10002025);

      d.    *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

      e.    *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

      f.    *State ex rel. Jim Petro v. Craftmatic Organization, Inc*. (OPIF #10002347);

      g.    *Cranford v. Joseph Airport Toyota, Inc*. (OPIF #10001586);

      h.    *Brown v. Spears* (OPIF #10000403);

      i.    *Brinkman v. Mazda Motor of America, Inc*. (OPIF #10001427);

      j.    *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326); and

      k.    *Walls v. Harry Williams d/b/a Butch's Auto Sales* (OPIF #10001524).

406.    BMW was under a duty to Plaintiffs and Ohio State Class Members to disclose the Transfer Case Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Transfer Case Defect because BMW:

      a.    Knew the Transfer Case Defect was a material fact that would affect Plaintiffs' or Ohio State Class members' decisions to buy or lease Class Vehicles;

      b.    Possessed knowledge of the risks posed by the foregoing;

      c.    Intentionally concealed the foregoing from Plaintiffs and Ohio State Class Members; and/or

      d.    Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and Ohio State Class Members that contradicted these representations.

407.    Despite possessing information to the contrary, BMW failed to disclose and actively concealed the Transfer Case Defect while continuing to market the Class Vehicles as world-class and reliable. The deception made reasonable consumers believe that Class Vehicles were of high-quality, and designed and made by a company that stood behind its vehicles once they were on the road.

408.    In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

409.    The facts that BMW concealed from Plaintiffs and Ohio State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the Transfer Case Defect to be an undesirable quality, as Plaintiffs and Ohio State Class Members did. Had Plaintiffs and Ohio State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

410.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Ohio State Class members, about the reliability, performance, and true value of the Class Vehicles. Plaintiffs, like all objectively reasonable consumers, did not expect the transfer case in his Class Vehicle to fail and require significant, costly repairs.

411.    Plaintiffs and Ohio State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their

customers to refrain from unfair and deceptive practices under the Ohio CPSA. All owners and lessees of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

412.    As a direct and proximate result of BMW's misconduct, Plaintiffs and Ohio State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

413.    BMW's violations present a continuing risk to Plaintiffs and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

414.    Pursuant to Ohio Rev. Code § 1345.09, Plaintiffs and the Ohio State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages - trebled, and attorneys' fees, costs, and any other just and proper relief, to the extend available under the Ohio CSPA.

### FOURTEENTH CAUSE OF ACTION
**Violations of the Ohio Deceptive Trade Practices Act**
**Ohio Rev. Code §§ 4165.01 *et seq.***
**(on behalf of the Ohio State Class)**

416.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

417.    Plaintiffs Richard Grad and Thomas Kavanaugh bring this claim on behalf of themselves and the Ohio State Class against all Defendants.

418.    Defendants, Plaintiffs, and the Ohio State Class are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

419.    Defendants engaged in "the course of [its] business" within the meaning of Ohio Rev. Code § 4165.02(A) with respect to the acts alleged herein.

420.    The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02(A) ("Ohio DTPA") provides that a "person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation," the person does any of the following: "(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . . (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; . . . (9) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; . . . [or] (11) Advertises goods or services with intent not to sell them as advertised."

421.    By failing to disclose the defective nature of the Class Vehicles to Plaintiffs and Ohio State Class Members, BMW engaged in deceptive trade practices in violation of the Ohio CPSA by: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

422.    BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's course of trade or business, were material, were capable of deceiving a substantial portion of the

purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

423.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were not suitable for their intended use.

424.    By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW actively concealed these defects from consumers by denying the existence of the defects to Ohio State Class Members who contacted BMW about the failure of their transfer cases and failing to offer Ohio State Class Members full reimbursement for the replacement of their defective transfer cases.

425.    BMW was under a duty to Plaintiffs and Ohio State Class Members to disclose the Transfer Case Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Transfer Case Defect because BMW:

    a.    Knew the Transfer Case Defect was a material fact that would affect Plaintiffs' or Ohio State Class members' decisions to buy or lease Class Vehicles;

    b.    Possessed knowledge of the risks posed by the foregoing;

    c.    Intentionally concealed the foregoing from Plaintiffs and Ohio State Class Members; and/or

    d.    Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and Ohio State Class Members that contradicted these representations.

426.    Despite possessing information to the contrary, BMW failed to disclose and actively concealed the Transfer Case Defect while continuing to market the Class Vehicles as world-class and reliable. The deception made reasonable consumers believe that Class Vehicles were of high-quality, and designed and made by a company that stood behind its vehicles once they were on the road.

427.    Defendants knew or should have known that their conduct violated the Ohio DTPA. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

428.    The facts that BMW concealed from Plaintiffs and Ohio State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the Transfer Case Defect to be an undesirable quality, as Plaintiffs and Ohio State Class Members did. Had Plaintiffs and Ohio State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

429.    BMW's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Ohio State Class members, about the reliability, performance, and true value of the Class Vehicles. Plaintiffs, like all objectively reasonable consumers, did not expect the transfer case in his Class Vehicle to fail and require significant, costly repairs.

430.    Plaintiffs and Ohio State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of

and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Ohio DTPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

431.    As a direct and proximate result of BMW's misconduct, Plaintiffs and Ohio State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

432.    BMW's violations present a continuing risk to Plaintiffs and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved.  BMW's unlawful acts and practices complained of herein affect the public interest.

433.    Pursuant to Ohio Rev. Code § 4165.03, Plaintiffs and the Ohio State Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Ohio DTPA.

    D.    **Virginia**

**FIFTEENTH CAUSE OF ACTION**
**Violations of the Virginia Consumer Protection Act**
**Va. Code Ann. §§ 59.1, *et seq.***
**(on behalf of the Virginia State Class)**

435.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

436.    Plaintiff Sir Arnold Gonzalez brings this claim on behalf of himself and the Virginia State Class against all Defendants.

437.    BMW, Plaintiff, and Virgnia State Class Members are each a "person" within the meaning of Virginia's Consumer Protection Act ("Virginia CPA"). Va. Code. Ann. § 59.1-198.

438.    BMW is a "supplier" within the meaning of Va. Code. Ann. § 59.1-198.

439.    Plaintiff and the Virginia State Class Members' purchases and leases of the Class Vehicles are "consumer transactions" within the meaning of Va. Code. Ann. § 59.1-198.

440.    The Virginia CPA prohibits "fraudulent acts or practices" which include misrepresenting "that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model," representing "that goods or services have certain quantities, characteristics, ingredients, uses, or benefits," and advertising "goods or services with the intent not to sell them as advertised." Va. Code. Ann. § 59.1-200.

441.    By failing to disclose the defective nature of the Class Vehicles to Plaintiff and Virginia State Class Members, BMW engaged in deceptive trade practices in violation of the Virginia CPA, because BMW represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another. *See* Va. Code. Ann. §§ 59.1-200(A)(5) & (6).

442.    BMW advertised the Class Vehicles with the intent not to sell them as advertised, in violation of the Virginia CPA. *See* Va. Code. Ann. § 59.1-200(A)(8).

443.    BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

444.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were not suitable for their intended use.

445.    By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW actively concealed these defects from consumers by denying the existence of the defects to Virginia State Class Members who contacted BMW about the failure of their transfer cases and failing to offer Virginia State Class Members full reimbursement for the replacement of their defective transfer cases.

446.    BMW was under a duty to Plaintiff and Virginia State Class Members to disclose the Transfer Case Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Transfer Case Defect because BMW:

a.    Knew the Transfer Case Defect was a material fact that would affect Plaintiff's or Virginia State Class Members' decisions to buy or lease Class Vehicles;

b.    Possessed knowledge of the risks posed by the foregoing;

c.    Intentionally concealed the foregoing from Plaintiff and Virginia State Class Members; and/or

d.    Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and Virginia State Class Members that contradicted these representations.

447.    Despite possessing information to the contrary, BMW failed to disclose and actively concealed the Transfer Case Defect while continuing to market the Class Vehicles as world-class and reliable. The deception made reasonable consumers believe that Class Vehicles

were of high-quality, and designed and made by a company that stood behind its vehicles once they were on the road.

448. BMW knew or should have known that its conduct violated the Virginia CPA. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

449. The facts that BMW concealed from Plaintiff and Virginia State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the Transfer Case Defect to be an undesirable quality, as Plaintiff and Virginia State Class Members did. Had Plaintiff and Virginia State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

450. Plaintiff, like all objectively reasonable consumers, did not expect the transfer case in his Class Vehicle to fail and require significant, costly repairs.

451. As a direct and proximate result of BMW's misconduct, Plaintiff and Virginia State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

452. BMW's violations present a continuing risk to Plaintiff and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer

Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

453.    As a direct and proximate result of BMW's violations of the Virginia CPA, Plaintiff and Virginia State Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

454.    Plaintiff seeks a) actual damages, b) statutory damages, c) exemplary and/or punitive damages, d) pre- and post-judgment interest, e) attorneys' fees and costs, and f) any other just and proper relief available under the Virginia CPA. *See* Va. Code. Ann. § 59.1-204.

    **E.**    <u>**Iowa**</u>

**<u>SIXTEENTH CAUSE OF ACTION</u>**
**Violations of the Iowa Private Right of Action for Consumer Frauds Act**
**Iowa Code Ann. §§ 714H, *et seq.***
**(on behalf of the Iowa State Class)**

456.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

457.    Plaintiff Joseph Manemann brings this claim on behalf of himself and the Iowa State Class against all Defendants.

458.    BMW, Plaintiff, and Iowa State Class Members are each a "person" within the meaning of the Iowa Private Right of Action for Consumer Frauds Act ("Iowa PRACFA"). Iowa Code. Ann. § 714h.2.

459.    Plaintiff and the Iowa State Class Members are each a "consumer" within the meaning of Iowa Code. Ann. § 714h.2.

460.    The Iowa PRACFA prohibits "a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that

101

others rely" upon the same. Iowa Code. Ann. § 714h.3. It is "deceptive advertising" for "a person to represent in connection with the lease, sale, or advertisement of any merchandise that the advertised merchandise has certain performance characteristics, accessories, uses, or benefits" if no reasonable basis for the claim exists at the time of the representation. Iowa Code. Ann. § 714.16(2)(a).

461.    By failing to disclose the defective nature of the Class Vehicles to Plaintiff and Iowa State Class Members, BMW engaged in deceptive trade practices in violation of the Iowa PRACFA, because BMW represented that the Class Vehicles had characteristics and benefits that they do not have. *See* Iowa Code. Ann. §§ 714h.3; 714.16(2)(a).

462.    BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

463.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were not suitable for their intended use.

464.    By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW actively concealed these defects from consumers by denying the existence of the defects to Iowa State Class Members who contacted BMW about the failure of their transfer cases and failing to offer Iowa State Class Members full reimbursement for the replacement of their defective transfer cases.

465.    BMW was under a duty to Plaintiff and Iowa State Class Members to disclose the Transfer Case Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Transfer Case Defect because BMW:

a.    Knew the Transfer Case Defect was a material fact that would affect Plaintiff's or Iowa State Class Members' decisions to buy or lease Class Vehicles;

b.    Possessed knowledge of the risks posed by the foregoing;

c.    Intentionally concealed the foregoing from Plaintiff and Iowa State Class Members; and/or

d.    Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and Iowa State Class Members that contradicted these representations.

466.    Despite possessing information to the contrary, BMW failed to disclose and actively concealed the Transfer Case Defect while continuing to market the Class Vehicles as world-class and reliable. The deception made reasonable consumers believe that Class Vehicles were of high-quality, and designed and made by a company that stood behind its vehicles once they were on the road.

467.    BMW knew or should have known that its conduct violated the Iowa PRACFA. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

468.    The facts that BMW concealed from Plaintiff and Iowa State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider

the Transfer Case Defect to be an undesirable quality, as Plaintiff and Iowa State Class Members did. Had Plaintiff and Iowa State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

469.    Plaintiff, like all objectively reasonable consumers, did not expect the transfer case in his Class Vehicle to fail and require significant, costly repairs.

470.    As a direct and proximate result of BMW's misconduct, Plaintiff and Iowa State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

471.    BMW's violations present a continuing risk to Plaintiff and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved.  BMW's unlawful acts and practices complained of herein affect the public interest.

472.    As a direct and proximate result of BMW's violations of the Iowa PRACFA, Plaintiff and Iowa State Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

473.    Plaintiff seeks a) actual damages, b) statutory damages, c) exemplary and/or punitive damages, d) declaratory relief, e) injunctive relief, f) pre- and post-judgment interest, g)

attorneys' fees and costs, and h) any other just and proper relief available under the Iowa

PRACFA. *See* Iowa Code. Ann. § 714h.5.

F.      **Georgia**

**SEVENTEENTH CAUSE OF ACTION**
**Violations of the Georgia Fair Business Practices Act**
**O.C.G.A. §§ 10-1-390, *et seq.***
**(on behalf of the Georgia State Class)**

475.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

476.    Plaintiff David Goodell brings this claim on behalf of himself and the Georgia

State Class against all Defendants.

477.    BMW NA and BMW AG are each a "person" as defined by the Georgia Fair

Business Practices Act ("Georgia FBPA").  O.C.G.A. § 10-1-392(a)(24).

478.    Plaintiff and Class Members are "consumers" within the meaning of the Georgia

FBPA.  O.C.G.A. § 10-1-392(a)(6).

479.    The purchase of Class Vehicles by Plaintiff and Class Members constituted

"consumer transactions" as defined by the Georgia FBPA.  O.C.G.A. § 10-1-392(a)(10).

480.    The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct

of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful,

O.C.G.A. § 10-1-393(a), including but not limited to "representing that goods or services have

sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have,"

"[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are

of another," and "[a]dvertising goods or services with intent not to sell them as advertised," *id.*

§ 10-1-393(b)(5), (7) & (9).

481.    By failing to disclose the defective nature of the Class Vehicles to Plaintiff and

Class Members, BMW violated the Georgia FBPA, because BMW represented that the Class

Vehicles had characteristics and benefits that they do not have, and represented that the Class

Vehicles were of a particular standard, quality, or grade (i.e., reliable, high-quality, etc.) when

they were of another.  *See* O.C.G.A. § 10-1-393(b)(5) & (7).

482.    BMW advertised the Class Vehicles (as reliable, high-quality, etc.) with the intent

not to sell them as advertised, in violation of O.C.G.A. § 10-1-393(b)(9).

483.    BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's

course of trade or business, were material, were capable of deceiving a substantial portion of the

purchasing public, and as a result, caused economic harm to owners and purchasers of the Class

Vehicles.

484.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class

Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were

not suitable for their intended use.

485.    By 2018 at the latest, BMW had exclusive knowledge of material facts

concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW

actively concealed these defects from consumers by denying the existence of the defects to

Georgia State Class Members who contacted BMW about the failure of their transfer cases and

failing to offer Georgia State Class Members full reimbursement for the replacement of their

defective transfer cases.

486.    BMW was under a duty to Plaintiff and Georgia State Class Members to disclose

the Transfer Case Defect, as well as the associated costs that would have to be expended in order

to repair the Class Vehicles due to the Transfer Case Defect because BMW:

a.    Knew the Transfer Case Defect was a material fact that would affect

Plaintiff's or Georgia State Class Members' decisions to buy or lease Class Vehicles;

b.      Possessed knowledge of the risks posed by the foregoing;

c.      Intentionally concealed the foregoing from Plaintiff and Georgia State Class Members; and/or

d.      Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and Georgia State Class Members that contradicted these representations.

487.    BMW knew or should have known that its conduct violated the Georgia FBPA. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

488.    The facts that BMW concealed from Plaintiff and Georgia State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the Transfer Case Defect to be an undesirable quality, as Plaintiff and Georgia State Class Members did. Had Plaintiff and Georgia State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

489.    Plaintiff, like all objectively reasonable consumers, did not expect the transfer case in his Class Vehicle to fail and require significant, costly repairs.

490.    As a direct and proximate result of BMW's misconduct, Plaintiff and Georgia State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an

inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

491.    BMW's violations present a continuing risk to Plaintiff and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

492.    Plaintiff and Georgia State Class Members are entitled to equitable relief.

493.    BMW received proper notice of its alleged violations of the Georgia FBPA pursuant to O.C.G.A. § 10-1-399(b), via a letter sent to BMW NA on October 6, 2025. Ex. A. In response to this letter, BMW did not offer to provide the requested relief.

494.    Thus, pursuant to O.C.G.A. § 10-1-399, Plaintiff and Class Members seek an order enjoining BMW's unfair, unlawful, and/or deceptive practices, declaratory relief, actual and statutory damages, attorneys' fees and expenses, and treble damages as to both BMW NA and BMW AG and punitive damages as to BMW NA only, as permitted under the Georgia FBPA.

## EIGHTEENTH CAUSE OF ACTION
**Violations of Georgia's Uniform Deceptive Trade Practices Act**
**O.C.G.A. §§ 10-1-370, *et seq.***
**(on behalf of the Georgia State Class)**

496.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

497.    Plaintiff David Goodell brings this claim on behalf of himself and the Georgia State Class against all Defendants.

498.    BMW, Plaintiff, and Georgia State Class Members are each a "person" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA"). O.C.G.A. § 10-1-371(5).

499.    The UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and services," "engaging in any other conduct which similar creates a likelihood of confusion or misunderstanding," and "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised."  O.C.G.A. § 10-1-372.

500.    By failing to disclose the defective nature of the Class Vehicles to Plaintiff and Georgia State Class Members, BMW engaged in deceptive trade practices in violation of the Georgia UDTPA, because BMW represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade (i.e., reliable, etc.) when they were of another.  *See* O.C.G.A. § 10-1-372(5), (7), & (9).

501.    BMW advertised the Class Vehicles (as reliable, etc.) with the intent not to sell them as advertised, in violation of the Georgia UDTPA.  *See* O.C.G.A. § 10-1-372(9).

502.    BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

503.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were not suitable for their intended use.

504.    By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW actively concealed these defects from consumers by denying the existence of the defects to Georgia State Class Members who contacted BMW about the failure of their transfer cases and failing to offer Georgia State Class Members full reimbursement for the replacement of their defective transfer cases.

505.    BMW was under a duty to Plaintiff and Georgia State Class Members to disclose the Transfer Case Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Transfer Case Defect because BMW:

a.    Knew the Transfer Case Defect was a material fact that would affect Plaintiff's or Georgia State Class Members' decisions to buy or lease Class Vehicles;

b.    Possessed knowledge of the risks posed by the foregoing;

c.    Intentionally concealed the foregoing from Plaintiff and Georgia State Class Members; and/or

d.    Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and Georgia State Class Members that contradicted these representations.

506.    BMW knew or should have known that its conduct violated the Georgia UDTPA. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as

to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

507.    The facts that BMW concealed from Plaintiff and Georgia State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the Transfer Case Defect to be an undesirable quality, as Plaintiff and Georgia State Class Members did. Had Plaintiff and Georgia State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

508.    Plaintiff, like all objectively reasonable consumers, did not expect the transfer case in his Class Vehicle to fail and require significant, costly repairs.

509.    As a direct and proximate result of BMW's misconduct, Plaintiff and Georgia State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

510.    BMW's violations present a continuing risk to Plaintiff and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

511.     As a direct and proximate result of BMW's violations of the Georgia UDTPA, Plaintiff and Georgia State Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

512.     Plaintiff seeks an order enjoining BMW's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA.  *See* O.C.G.A. § 10-1-373.

**G.    North Carolina**

**NINETEENTH CAUSE OF ACTION**
**Violations of the North Carolina Unfair Trade Practices Act**
**N.C. Gen. Stat. Ann. §§ 75-1, *et seq.***
**(on behalf of the North Carolina State Class)**

514.     Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

515.     Plaintiff Nancy Litaker Ridgeway brings this claim on behalf of herself and the North Carolina State Class against all Defendants.

516.     The North Carolina Unfair Trade Practices Act ("North Carolina UTPA") prohibits "deceptive acts practices in or affecting commerce." N.C. Gen. Stat. Ann. § 75-1.1.

517.     Plaintiff's and the North Carolina Class Members' purchases and leases of the Class Vehicles are "commerce" within the meaning of N.C. Gen. Stat. Ann. § 75-1.1.

518.     By failing to disclose the defective nature of the Class Vehicles to Plaintiff and North Carolina State Class Members, BMW engaged in deceptive trade practices in violation of the North Carolina UTPA, because BMW represented that the Class Vehicles had characteristics and benefits that they do not have; represented that the Class Vehicles were of a particular standard, quality, or grade (*i.e.*, reliable, etc.) when they were of another; and advertised the Class Vehicles (as reliable, etc.) with the intent not to sell them as advertised.

519. BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

520. BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were not suitable for their intended use.

521. By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW actively concealed these defects from consumers by denying the existence of the defects to North Carolina State Class Members who contacted BMW about the failure of their transfer cases and failing to offer North Carolina State Class Members full reimbursement for the replacement of their defective transfer cases.

522. BMW was under a duty to Plaintiff and North Carolina State Class Members to disclose the Transfer Case Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Transfer Case Defect because BMW:

a. Knew the Transfer Case Defect was a material fact that would affect Plaintiff's or North Carolina State Class Members' decisions to buy or lease Class Vehicles;

b. Possessed knowledge of the risks posed by the foregoing;

c. Intentionally concealed the foregoing from Plaintiff and North Carolina State Class Members; and/or

113

> d.  Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and North Carolina State Class Members that contradicted these representations.

523.  BMW knew or should have known that its conduct violated the North Carolina UTPA. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

524.  The facts that BMW concealed from Plaintiff and North Carolina State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the Transfer Case Defect to be an undesirable quality, as Plaintiff and North Carolina State Class Members did. Had Plaintiff and North Carolina State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

525.  Plaintiff, like all objectively reasonable consumers, did not expect the transfer case in her Class Vehicle to fail and require significant, costly repairs.

526.  As a direct and proximate result of BMW's misconduct, Plaintiff and North Carolina State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

527.    BMW's violations present a continuing risk to Plaintiff and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

528.    As a direct and proximate result of BMW's violations of the North Carolina UTPA, Plaintiff and North Carolina State Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

529.    Plaintiff seeks an order enjoining BMW's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the North Carolina UTPA.  *See* N.C. Gen. Stat. Ann. §§ 75-16; 75-16.1; 75-19.

### H.    Maryland

### TWENTIETH CAUSE OF ACTION
**Violations of the Maryland Consumer Protection Act
Md. Com. Law Code Ann. §§ 13-101, *et seq.*
(on behalf of the Maryland State Class)**

531.    Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

532.    Plaintiff Amarjeet Sidhu brings this claim on behalf of himself and the Maryland State Class against all Defendants.

533.    BMW, Plaintiff, and Maryland State Class Members are each a "person" within the meaning of Maryland's Consumer Protection Act ("Maryland CPA"). Md. Com. Law Code. Ann. § 13-101(h).

534.    BMW is a "merchant" within the meaning of Md. Com. Law Code. Ann. § 13-101(g).

115

535.     The Class Vehicles are "consumer goods" within the meaning of Md. Com. Law Code. Ann. § 13-101(d).

536.     The Maryland CPA prohibits "unfair, abusive, or deceptive trade practices" which include representation that consumer goods "have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have," that consumer goods "are of a particular standard, quality, grade, style, or model which they are not," and advertisement of consumer goods "without intent to sell, lease, or rent them as advertised or offered." Md. Com. Law Code. Ann. §§ 13-301(2) & (5). The Maryland CPA further prohibits "misrepresentation, or knowing concealment, suppression, or omission of any material fact with intent that a consumer rely on the same in connection with" the "sale of any consumer goods." Md. Com. Law Code. Ann. § 13-301(9).

537.     By failing to disclose the defective nature of the Class Vehicles to Plaintiff and Maryland State Class Members, BMW engaged in deceptive trade practices in violation of the Maryland CPA, because BMW represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another. *See* Md. Com. Law Code. Ann. §§ 13-301(2) & (5).

538.     BMW advertised the Class Vehicles with the intent not to sell them as advertised, in violation of the Maryland CPA. *See* Md. Com. Law Code. Ann. § 13-301(9).

539.     BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to owners and purchasers of the Class Vehicles.

116

540.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were not suitable for their intended use.

541.    By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW actively concealed these defects from consumers by denying the existence of the defects to Maryland State Class Members who contacted BMW about the failure of their transfer cases and failing to offer Maryland State Class Members full reimbursement for the replacement of their defective transfer cases.

542.    BMW was under a duty to Plaintiff and Maryland State Class Members to disclose the Transfer Case Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Transfer Case Defect because BMW:

a.    Knew the Transfer Case Defect was a material fact that would affect Plaintiff's or Maryland State Class Members' decisions to buy or lease Class Vehicles;

b.    Possessed knowledge of the risks posed by the foregoing;

c.    Intentionally concealed the foregoing from Plaintiff and Maryland State Class Members; and/or

d.    Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and Maryland State Class Members that contradicted these representations.

543.    Despite possessing information to the contrary, BMW failed to disclose and actively concealed the Transfer Case Defect while continuing to market the Class Vehicles as world-class and reliable. The deception made reasonable consumers believe that Class Vehicles

117

were of high-quality, and designed and made by a company that stood behind its vehicles once they were on the road.

544. BMW knew or should have known that its conduct violated the Maryland CPA. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

545. The facts that BMW concealed from Plaintiff and Maryland State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would consider the Transfer Case Defect to be an undesirable quality, as Plaintiff and Maryland State Class Members did. Had Plaintiff and Maryland State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

546. Plaintiff, like all objectively reasonable consumers, did not expect the transfer case in his Class Vehicle to fail and require significant, costly repairs.

547. As a direct and proximate result of BMW's misconduct, Plaintiff and Maryland State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

548. BMW's violations present a continuing risk to Plaintiff and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer

Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

549.     As a direct and proximate result of BMW's violations of the Maryland CPA, Plaintiff and Maryland State Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

550.     Plaintiff seeks a) actual damages, b) statutory damages, c) exemplary and/or punitive damages, d) pre- and post-judgment interest, e) attorneys' fees and costs, and f) any other just and proper relief available under the Maryland CPA. *See* Md. Com. Law Code. Ann. § 13-408.

**I.     Washington**

**TWENTY-FIRST CAUSE OF ACTION**
**Violations of the Washington Consumer Protection Act**
**Washington Rev. Code §§ 19.86.010, *et seq.***
**(on behalf of the Washington State Class)**

552.     Plaintiffs repeat and reallege paragraphs 1-197 as if fully set forth herein.

553.     Plaintiff James Robbins brings this claim on behalf of himself and the Washington State Class against all Defendants.

554.     Plaintiff and the Washington State Class Members are "persons" within the meaning of the Washington Consumer Protection Act ("Washington CPA") Wash. Rev. Code § 19.86.010(2).

555.     The Washington CPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

556.    BMW engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Washington CPA. By failing to disclose the Transfer Case Defect, by concealing the Transfer Case Defect, by marketing its vehicles as reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued performance and reliability and that stood behind its vehicles after they were sold, BMW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. BMW systematically misrepresented concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Transfer Case Defect in the course of its business.

557.    BMW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentation, or concealment in connection with the sale of the Class Vehicles.

558.    BMW's unfair and deceptive acts or practices occurred repeatedly in BMW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and, as a result, caused economic harm to purchasers and lessees of the Class Vehicles. .

559.    BMW knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

560.    BMW knew or should have known that its conduct violated the Washington CPA.

561.    BMW intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff and the Washington State Class Members.

562.    BMW knew, by 2018 at the latest, and certainly before the sale of the Class Vehicles, that the Class Vehicles' transfer cases suffered from a defect causing failure and were not suitable for their intended use.

563.    By 2018 at the latest, BMW had exclusive knowledge of material facts concerning the existence of the Transfer Case Defect in its Class Vehicles. Furthermore, BMW actively concealed these defects from consumers by denying the existence of the defects to Washington State Class Members who contacted BMW about the failure of their transfer cases and failing to offer Washington State Class Members full reimbursement for the replacement of their defective transfer cases.

564.    BMW was under a duty to Plaintiff and Washington State Class Members to disclose the Transfer Case Defect, as well as the associated costs that would have to be expended in order to repair the Class Vehicles due to the Transfer Case Defect because BMW:

a.    Knew the Transfer Case Defect was a material fact that would affect Plaintiff's or Washington State Class Members' decisions to buy or lease Class Vehicles;

b.    Possessed knowledge of the risks posed by the foregoing;

c.    Intentionally concealed the foregoing from Plaintiff and Washington State Class Members; and/or

d.    Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and Washington State Class Members that contradicted these representations.

565.    In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause of the transfer case failure in the Class Vehicles, BMW knowingly and intentionally concealed material facts and breached its duty not to do so.

566.    The facts that BMW concealed from Plaintiff and Washington State Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase a Class Vehicle. Moreover, a reasonable consumer would

consider the Transfer Case Defect to be an undesirable quality, as Plaintiff and Washington State Class Members did. Had Plaintiff and Washington State Class members known that the Class Vehicles had the Transfer Case Defect, they would not have purchased the Class Vehicles, or would have paid less for them.

567.    Plaintiff, like all objectively reasonable consumers, did not expect the transfer case in his Class Vehicle to fail and require significant, costly repairs.

568.    As a direct and proximate result of BMW's misconduct, Plaintiff and Washington State Class Members received goods that had substantially impaired value at the point of sale, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of thousands of dollars, the costs of necessary present and future repairs, an inability to use the Class Vehicles for their intended purpose, and diminution of resale value, in an amount to be determined at trial.

569.    BMW's violations present a continuing risk to Plaintiff and to the general public because BMW continues to manufacture, distribute, and market Class Vehicles with a Transfer Case Defect without providing appropriate relief and because replacement transfer case fluid and transfer cases are similarly likely to fail until the Transfer Case Defect is resolved. BMW's unlawful acts and practices complained of herein affect the public interest.

570.    As a direct and proximate result of BMW's violations of the Washington CPA, Plaintiff and Washington State Class Members have suffered and will continue to suffer injury-in-fact and/or actual damages.

571.    Plaintiff seeks a) actual damages, b) statutory damages, c) exemplary and/or punitive damages, d) declaratory relief, e) injunctive relief, f) pre- and post-judgment interest, g)

attorneys' fees and costs, and h) any other just and proper relief available under the Washington CPA. *See* Wash. Rev. Code § 19.86.090.

## XI.    RELIEF REQUESTED

572.    Plaintiffs, on behalf of themselves, and all others similarly situated, request the Court to enter judgment against BMW, as follows:

a.    an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

b.    a declaration that all Class Vehicles have a defect which results in transfer case failure and that this defect requires disclosure; that BMW must notify owners of the defect; and that any limitations for coverage of this defect in BMW's New Vehicle Limited Warranty and Certified Preowned Warranty are removed. See *Pella Corp. v. Saltzman*, 606 F.3d 391, 392 (7th Cir. 2010);

c.    an order enjoining BMW to reassess all prior claims, both in and out of warranty, related to transfer case fluid and transfer case repairs and to reimburse Class Members for money spent out of pocket for transfer case fluid replacement, replacement of their defective transfer cases, and associated costs, including as diagnostic fees, regardless of whether those costs fall within the limitations of the Extended Warranty;

d.    an order enjoining BMW, upon a Class Member's request, to pay the cost of regular inspections to determine whether the Transfer Case Defect is present, with any coverage disputes adjudicated by a special master;

e.    an order enjoining BMW from further deceptive distribution and sales practices with respect to the Class Vehicles, and to permanently repair the Class Vehicles so that they no longer possess the Transfer Case Defect;

f.      an award to Plaintiffs and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial against both BMW AG and BMW NA, and punitive damages as to BMW NA only;

g.      an order requiring BMW to disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten revenue it received from the sale of the Class Vehicles, or make full restitution thereof to Plaintiffs and Class Members;

h.      an award of attorneys' fees and costs, as allowed by law;

i.      an award of pre-judgment and post-judgment interest, as provided by law;

j.      leave to amend this Complaint to conform to the evidence obtained in discovery or produced at trial; and

k.      such other relief as may be appropriate under the circumstances.

## XII.    **DEMAND FOR JURY TRIAL**|

573.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated:  December 26, 2025          CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.


By: /s/James E. Cecchi
        James Cecchi

James Cecchi (jcecchi@carellabyrne.com)
Zachary Jacobs (zjacobs@carellabyrne.com)
CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700

Jonathan D. Selbin (jselbin@lchb.com) (*pro hac vice*
pending) LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9000

Kenneth S. Byrd (kbyrd@lchb.com) (*pro hac vice* pending)
Ellie E. Olson (eolson@lchb.com) (*pro hac vice* pending)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue South, Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000

Nathan Heber (nathan@heberhan.com) (*pro hac vice* pending)
You-Jin Han (you-jin@heberhan.com) (*pro hac vice* pending)
HEBER HAN, P.C.
3355 Lenox Road NE, Suite 750
Atlanta, GA 30326
Telephone: (470) 805-1468


*Attorneys for Named Plaintiffs and Proposed Class*